IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) ) Criminal No. 1:22-cr-00015-APM |
| v. | ) ) ) USA v. Stewart Rhodes, et al. |
| **KENNETH HARRELSON** | ) ) ) ) |
| **Defendant** | ) |

**DEFENDANT KENNETH HARRELSON'S REPLY TO THE OPPOSITION OF THE GOVERNMENT TO KENNETH HARRELSON'S MOTION FOR <u>REQUIRED DISCLOSURE OF EXCULPATORY INFORMATION</u>**

Defendant, Kenneth Harrelson, by and through undersigned counsel, Bradford L. Geyer, Esq., files this Reply to the Government's Opposition filed at ECF 272 on August 23, 2022, to Defendant Harrelson's Motion to Compel Disclosure of Exculpatory Information filed at ECF 268.

1) While the Government's Opposition is helpfully structured to respond to each section of Harrelson's motion in order, Defendant's Reply could perhaps be presented best by addressing themes.

2) Primarily, the Government ***does not*** dispute Harrelson's legitimate interests and <u>*right to receive the information*</u> he requested, with only a few exceptions (mainly about security systems).

3) Overwhelmingly, the Opposition, the Motion, and this Reply are joined at issue about whether the Government has or has not actually produced to the Defendants the *Brady* disclosures that it claims.

4) However, new information has just arisen from the Prosecution-sponsored tour on

Saturday, August 27, 2022, deepening the Government's non-compliance with *Brady v. Maryland*. Observations Saturday further prove more violations of *Brady*. And the U.S. Capitol Police tour once again politely refused to answer legitimate questions from defense counsel, thereby violating *Brady*. This is explained below.

5)  Because of the need to get specific and track what has and has not been actually produced, in the manner of a check list, Harrelson restates his requests in **EXHIBIT A**, to facilitate tracking down the actual status of each topic of information.

6)  Harrelson restates the claims of the Opposition in **EXHIBIT B**.

7)  Harrelson contends that each of the items in **EXHIBIT B** have not in fact been produced, at least in reference to the items that Harrelson demanded in **EXHIBIT A.**

8)  It is important and exculpatory, especially four weeks before trial, if the Government has no evidence on a topic. Given that the Prosecution must prove guilt – as to each element of a crime charged – beyond a reasonable doubt, yes, it does matter if the Government's response is that we have no information at all on the topic.

9)  The Court should also not misunderstand. This is not about a lack of consultation, but a genuine dispute, after consultation, about whether information has or has not actually been produced. This includes technical problems that many are not paying attention to.

10) The undersigned is not sure if the Government is intending to convey that it has buried exculpatory information so that it cannot be found by Defendants' counsel. Again, when the Defendant requests *Brady* materials

> **"The government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."**

*United States v. Saffarinia, 424 F.Supp.3d 46, 8 (D.D.C.), supported by United States v. Paxson,*

*861 F.2d 730, 737 (D.C. Cir. 1988).*

11) The vagueness of the Opposition claims could possibly mean that the Government has invited the Defendants to go searching on an Easter egg hunt or treasure hunt.

12) This also includes apparently a dispute about the Government's obligations with regard to burying required exculpatory information among 9 terabytes of data.

13) A specific request from any defendant for information that defense counsel analyzes as likely to be exculpatory is treated differently under *Brady* jurisprudence than the Government guessing whether information in its possession might need to be disclosed as exculpatory. *See Governing Law* in original motion at ECF 268.

14) The Prosecution's Opposition claims that the Government has met its *Brady* obligations.

15) On the contrary, undersigned counsel has a high degree of certainty that the information has actually not been produced and the Government has not met its *Brady* obligations.

16) Nevertheless, if the Government can show where this information been provided on a database system that actually works,[1] the undersigned counsel would be pleased to discuss it.

17) Local Rules of this District and the looming trial date put pressure on Harrelson to Reply to the Opposition on a short timetable.

18) Secondly, during Saturday's tour a USCP officer remarked that he had just received an audible alert on his phone (similar to weather or amber alerts but in this case specific to the security of the U.S. Capitol), touched the phone to dismiss the alert, and then commented that such alerts are frequent.

19) Therefore, it is clear that significant communications from January 6, 2021, have not

---

[1] Other counsels have explained that the Relativity system is unworkable. Also, the Deloitte Touche user agreement creates a waiver of attorney-client and work-product privilege and makes all notes or information added into the Relativity system property of Deloitte Touche.

been produced. There remain significant questions about why officers reacted very differently in different locations. If they all received alerts at the same time, this would establish the timeline and would help explain a lot of the discordant behavior of different officers at different doors. Those communications would explain a lot and should be disclosed. On our tour and on surveillance vide we observe police using their phones. This is crucial information that we require and for which we have asked the Government.

20) Also, while congenial, the USCP would not answer many of defense counsel's questions. In short, the U.S. Capitol Police on the tour arranged by the U.S. Attorney's Office for defense counsel manifests the belief that USCP officers are "our" witnesses.

> "Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, MODEL CODE OF PROF'L RESPONSIBILITY  Rule 3.8(d).

21) Thus, even on Saturday, one of the alleged victims of the crimes charged refused to disclose exculpatory *Brady* material.

22) While *Brady* obligations do not extend to the entirety of the government, they do include investigative agencies or agencies closely related who knew or should have known that information would be material to a prosecution arising from their direct involvement. Here the U.S. Capitol Police are directly related and fully aware of the events of January 6, 2021.

> The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under Brady, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the government, constitutes a due process violation. See 373 U.S. at 87, 83 S.Ct. 1194.
>
> **We have defined "Brady material" as "exculpatory information, material to a defendant's guilt or punishment, which the government**

> **knew about but failed to disclose to the defendant in time for trial." Coleman v. United States, 515 A.2d 439, 446 (D.C.1986). (quoting Lewis v. United States, 393 A.2d 109, 114 (D.C.1978), aff'd after rehearing, 408 A.2d 303 (D.C.1979)).**
>
> This case does not present the classic Brady situation involving information in the hands of prosecutors which they do not have an incentive to divulge. See *United States v. Brooks*, 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.
>
> The government asserts that the duty to disclose information under Brady does not include a duty to investigate the records of the Department of Corrections. See *Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate— and come to know—information which the defendant would like to have but the government does not possess."); *Levin v. Katzenbach*, 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the government is required to search for evidence favorable to the accused.").
>
> **However, the Brady doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, see *Brooks*, 296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search branches of government "closely aligned with the prosecution," id. at 222, 966 F.2d at 1503 (citation omitted). . . .**

*Robinson v. United States of America*, 825 A.2d 318 (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).* Furthermore,

> 1. Was the recording in the possession of the government?
>
> The government acknowledges that its disclosure obligation extends beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the government asserts that the Department of Corrections is not an investigative agency for this purpose.
>
> "[T]he duty of disclosure affects not only the prosecutor, ***but `the government as a whole, including its investigative agencies,'*** because the Jencks Act refers to evidence gathered by `the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App.

D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied Brady and Jencks requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations[2]. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

The case before us does not require that we go that far. **This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).

* * *

**Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

---

[2] This understated reference doesn't fully explain that the prosecution arose directly out of "WMATA regulations" concerning a threatening showdown on the WMATA bus.

> \* \* \*
>
> **The government does not contend otherwise. Under these circumstances, we agree with the trial court that the police, as an integral part of the prosecution team, had an obligation to secure the tape recording. Thus, the tape recording was in the government's "possession" for both Jencks and Rule 16 purposes.**

*Robinson v. United States*, 825 A.2d 318 326-329, (D.C. 2003) *(paragraph break added for emphasis and bold emphases added)*.

> \* \* \* When WMATA is seeking to enforce its regulations or to protect its employees and involves its police force, however, the tort immunity analysis is irrelevant in defining the obligation of the government to disclose evidence. Rather than look to the immunity analysis developed for different purposes, our focus in addressing the Jencks issue must be on the nature of the proceeding and the purpose of the Jencks Act.
>
> **When the statement being sought by the defense as *Jencks* material is so closely intertwined with a prosecution arising out of an attempt to enforce WMATA regulations and protect a WMATA employee,** *cf.* **United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), we conclude that production, upon request, is required.** See *United States v. Deutsch*, supra, 475 F.2d at 57. The prosecution arose as a result of Brady's efforts to assure that bus passengers paid their bus fares. He stopped the bus because some of the passengers were out of control, endangering further operation of the bus. The record suggests that calling his supervisor was the means by which he sought supervisory as well as police assistance.

*Wilson v. United States*, 568 A.2d 817 (D.C. 1990) *(paragraph break added for emphasis and bold emphases added)*.

23) Furthermore, on August 27, 2022, while a USCP officer was demonstrating the opening and closing of the doors into the East side of the Rotunda, he called up by radio to have the control room operate the doors. Therefore, defense counsel witnessed that a pro-Trump demonstrator could not have opened the doors from the East side of the Rotunda to the outside <u>either from the inside or the outside</u> without participation by the control room, being intimately familiar with the control room, where it is, how to get into the control room, how to operate the machinery, and almost certainly without having a digital key. This underscores the necessity of

the information about the operation of the doors requested.

24) Again, Harrelson is falsely accused of "breaching" – that is, breaking into – the Capitol through those doors or aiding and abetting others in doing so. What was witnessed on Saturday proves that Harrelson is innocent as no one could have broken into the Capitol from either the outside or the inside, but a USCP officer would have had to open the doors (possibly because there was a line of USCP officers outside of the doors who may have wanted to come inside).

25) The USAO may seek to address these new Brady violations by a Sur-Reply which would be fair.

26) Third, as shown in **EXHIBIT C**, a number of people have recently been identified, arrested, or interviewed.

27) Yet the Government has not produced any discovery or disclosures from these persons despite FBI searched of their documents and storage devices having been recently completed.

28) That is, we have hard proof that the Government has not disclosed information seized from many specifically-identifiable witnesses or custodians of information that the Government attested was material enough to seize.

29) The Court should recall that the parties have had discussions about this with the Court over six to eight months, and defense counsel have raised that continuing information is still feeding the mouth of the pipeline, and the Government could not say either last week or six months ago when more information will stop flowing into the pipeline.

30) This trial is premature.

31) The Government faced a statute of limitations of at least five years. Yet the Government started to arrest people on January 7, 2021. The Prosecution should have waited within a five year statute of limitations until they were ready. If the Government cannot identify key actors at

key locations and times, who are unquestionably witnesses and very likely significant witnesses, how can they be ready for trial? For example on Page 9 of its Opposition, the Government states: "The government is unable to provide information about unknown individuals" -- in the context of specific, real people seen on video close enough to the Oath Keepers to be witnesses. Yet the Court is being asked to bend or break the Constitutional rights of these Defendants. Harrelson is entitled to due process and proper disclosures notwithstanding whatever non-judicial motives for rushing the Government may feel.

32) The Opposition's Argument paragraph (b) concerns other exculpatory information demanded and required to be disclosed concerning the 10 ton, 17 feet high solid bronze Columbus Doors. If the U.S. Capitol Police had detected a threat from the crowds, USCP would have closed the Columbus Doors hours earlier. The fact that the doors were not closed is proof that no threat was perceived to exist until pipe bombs were discovered and that ***there was never any threat from these Defendants.***

33) The Opposition's Argument paragraph (c) argues that the narrow, limited tours provided by the prosecution should be adequate. As stated in Harrelson's motion, the very short and narrow tours are helpful as better than nothing, but nevertheless inadequate. Harrelson's experts have specific areas they need to see that will be extraordinarily probative when almost no one understands the sequence of events in the West, then the East, played out impacting prolice behavior and dramatically impacting any analysis regarding knowledge of intent. When Harrelson's counsel attended the tour in January and August, a woman identifying herself as the General Counsel of the U.S. Capitol Police repeatedly interrupted questions from defense counsel and refused to allow the USCP tour guide to answer counsel's questions. This violated *Brady*.

Harrelson's co-counsel asked to see the window depicted in video recordings that was broken into, but whose location remains unidentified. In January, upon noticing that no such window was visible anywhere near the East central doors or the veranda at the top of the East central stairs, co-counsel repeatedly demanded to be shown the broken window, to show that the Oath Keepers could not have seen that broken window from where they were or aided and abetted anyone. Co-counsel also demanded to be shown the locations of demonstrations where the USCP had issued six (6) different permits for rallies and demonstrations on the U.S. Capitol Grounds on the afternoon of January 6, 2021.

The fact that the East Rotunda and Columbus Doors cannot be opened from the outside, where the crowds were, was a story blown open not by honest disclosures from the Government but by two U.S. Capitol police officers who nodded very strongly and affirmatively to defense counsel's question in January "So is it correct that these doors cannot be opened from the outside?"

34)     Opposition Argument paragraph (d) argues that "the government has provided the outline of the restricted area perimeter." But this is only on paper on a map not visible to anyone who demonstrated or gathered at the U.S. Capitol on January 6, 2021. There were no signs posting the map with lines drawn around it that the Government relies upon. The fact that somewhere in a filing cabinet within the offices of the USCP there was a file folder with a map in it – if anyone had known to ask for it – does not establish a restricted area. This is in the nature of a protective order or temporary restraining order that was never served on the person it purportedly restricts.

35) Opposition Argument paragraph (e) argues that none of the Oath Keepers led any attack on the U.S. Capitol, and therefore the requests are not material. Harrelson would accept a

stipulation that "none of the Oath Keepers led any attack on the U.S. Capitol on or about January 6, 2021." Without a stipulation, all of the information demanded would be required as exculpatory.

36) Opposition Argument paragraph (f) argues that "The government has already provided memoranda documenting interviews of a number of U.S. Capitol Police and D.C. Metropolitan Police Department Officers *whom the defendants encountered* at the Capitol on January 6, 2021" (italics added).

However Harrelson has not received such memoranda. Furthermore, this is not a small or tangential point. The Government's case at least against Harrelson hangs almost entirely upon the wall peg of assuming that Harrelson and Dolan pushed any police officer at the East central doors while entering the Rotunda. The video recordings prove they did not. After Harrelson and Dolan entered, the video recordings show USCP officers stopping and checking if would-be entrants were Oath Keepers, waving the Oath Keepers in to the building but keeping some non-Oath Keepers out. At one point an Oath Keepers Defendant points to his Oath Keepers patch, whereupon the USCP police officer tugs at his arm as he walks *into* the building and the Oath Keeper after him is actually yanked in by police with his dog in tow. Oath Keepers move through the crowd and intermingle with police where they are often singled out for permission to enter differently from other demonstrators. This goes to intent.

It is not adequate under *Brady* for the Government to provide interviews – note the Opposition does not claim that it provided the interviews but only "memoranda" about them – without identifying which police officers are relevant. Failing to connect various documents to disclosure of the particular officers that the Government claims were hassled deprives the Defendants of the ability to know which officers' statements are relevant. Leaving Defendants

to speculate whether *this* person in a document is *that* person the Government accuses Harrelson of battering is not adequate.

Nevertheless, Harrelson will look forward to the Government pointing to where any such information has been disclosed or will be disclosed.

37) Opposition Argument paragraph (g) addresses the similar issue, worded a little differently to make sure the information was produced, that the government "must provide any and all evidence of (a) precisely which Oath Keeper defendant the government contends injured any law enforcement officer, (b) precisely which law enforcement officer (which may be identified by a code number withholding their non-public actual identity), and (c) exactly how in complete description [the government] contend[s] any defendant injured them." ECF No. 268 at 23-24."

The Opposition claims that "The government has already provided the defense with the information responsive to these questions." However, the Government has not provided Harrelson with information responsive to these questions. Again, this is one of the key issues in the case. Sadly, there were law enforcement officers injured. But not by any of these Defendants. Information showing that none of the injured officers were injured by any of these Defendants is exculpatory and causes most of the prosecution's case against these Defendants to collapse, because it shows no intent to obstruct anything, no plan to enter the Capitol building, etc.

One injured police officer is one too many. But the Government is erroneously trying to show intent by Harrelson from things that never happened. The prosecution must prove beyond a reasonable doubt that *these* Defendants injured *specific* police officers, which we know they did not.

38) Concerning Opposition Argument paragraph (h), Harrelson's counsel looks forward to

the Government continuing to attempt to identify these likely witnesses. However, as stated above, the Government argues that "The government is unable to provide information about unknown individuals." Harrelson simply does not credit that in what is called one of the largest investigations in the history of U.S. law enforcement the FBI has not known a long time ago who all of these people are.

39) Concerning Opposition Argument paragraph (i), Harrelson rejects the Government's theory – obvious before but never before clearly stated – that everyone out of 10,000 demonstrators can all be the organizers of the 10,000 demonstrators. An organizer must have someone to organize other than themselves. The Opposition argues that "The possible culpability of these other individuals does not negate that Defendant Harrelson entered into a conspiracy in violation of Counts One, Two, and Four of the Indictment …" Harrelson insists that, yes, actually, it does negate guilt by Harrelson.

Harrelson did not ask about the "possible culpability" -- implying a lesser involvement or lesser culpability – of other persons. Harrelson asked for information that other people are the actual <u>organizers</u> and actually did what Harrelson did not do that often is meticulously documented on video. The request is not whether other people have some culpability subordinate to Harrelson as an organizer. The request is for all information about the actual organizing of January 6 by persons who are not any of these Defendants. Harrelson asked for "evidence that others ***actually organized, conspired, urged, or encouraged people*** to enter and even attack the U.S. Capitol tends to prove that Harrelson did not." ECF No. 268 at 27-30 *(emphases added)*. Harrelson asked for disclosure of any evidence that other people – not him – did the organizing, conspiring, urging or encouragement of people to "attack" the U.S. Capitol. Specificity and detail about who did the actual organizing, conspiracy, urging or encouraging,

would very likely produce a clear understanding negating the possibility that it was Harrelson or his co-Defendants. The Government speculation at this point that the evidence would not negate Harrelson's guilt is premature.

40) Concerning Opposition Argument paragraphs (j) and (k), the Government revisits, admitting knowledge of and its obligation, the prosecution's certification to Judge Mehta at ECF No. 9. However, the Government has not produced the information which Judge Mehta ruled was required.

Opposition Argument paragraph (k) argues "Defendant Harrelson also seeks information about how the U.S. Capitol Police decision makers responded to the riot. *Id.* at 32. As discussed above, this information may be located in the FBI memoranda of interviews of USCP personnel in the House and Senate around the time the presiding officer of each House decided to recess, as well as contemporaneous communications (like radio runs, text messages, or emails) in the Capitol Police's possession that have already been produced."

Saying that topics Judge Mehta ordered to be disclosed in December 2021, "***may be located***" in the FBI memoranda of interviews of USCP personnel effectively admits that nobody ever looked, nine months after Judge Mehta ordered the USAO to give notice to the USCP by January 20, 2022. Indeed, what was the purpose of Judge Mehta directing the USAO to provide notice to the U.S. Capitol Police?

Actually, Kelly Meggs starting in November and now Harrelson were not asking about how the USCP "***responded***." The request was for any and all information about (i) when did the USCP officially decide that the Joint Session of Congress should be recessed (since it appears that this decision was made before the Oath Keepers arrived in the area), (ii) over what time period was the USCP evaluating any threat situation and arriving at the decision to recommend

that the Joint Session of Congress recess (since the beginning of the decision that Congress needed to recess likely started much earlier, much sooner than when the Oath Keepers arrived in the area), (iii) what was the nature of the threat perceived by USCP (because there are strong indications the reason the USCP recommended a recess to the Joint Session of Congress was the discovery of pipe bombs and not the presence or size of the crowds, such as the actual evacuation of Library of Congress and the Cannon House Office Building at about 1:10 PM to 1:15 Pm, so that the Oath Keepers' presence in the area had no relevance to the decision to recess the Joint Session of Congress), (iv) what was the reason why the USCP reached a decision to recommend a recess to the Joint Session of Congress (because if the reason Congress recessed had nothing to do with the Oath Keepers, then they did not obstruct an official proceeding).

The fact that the USCP has resisted disclosing this information since last November 2021 or earlier speaks convincingly that the information would prove Harrelson and his Co-Defendants innocent.

Harrelson disputes that the information mentioned has been provided.

41) Concerning Opposition Argument paragraphs (l), after May 2021 or later, we are now learning in public reports that the Secret Service, Department of Homeland Security, and Pentagon deleted text messages and emails from January 5-6, 2021.  The Defendants here are entitled to the presumption that the missing messages would have been exculpatory proving their innocence and under "spoliation of evidence" jurisprudence.

These Defendants are being prosecuted for being "*the* leaders" of an attack upon the U.S. Capitol.  The messages that the Biden Administration deleted sometime after February 27, 2021, could have recorded communications directly or indirectly from the Oath Keepers with Trump's leadership team -- or more likely proving by the absence of communications that any such

coordination happened.

42) Also, everything Harrelson is asking for, and much more, has been demanded by Harrelson's co-Defendants as far back as September 2021.

43) Also, the Government in its Opposition admits on Page 3 that (a) the Government has produced "over 30,000 files consisting of body-worn and hand-held camera footage from five law enforcement agencies and surveillance-camera footage from three law enforcement agencies and the Hilton hotel," (b) "the files provided amount to over nine terabytes of information and **would take at least 105 days[3] to view continuously**" *[emphasis added]*, (c) "The government has provided detailed logs describing the custodian, location, and time periods for each video file in evidence.com," and (d) "In addition, the government has provided hundreds of hours of work product consisting of analytical and mapping information for the sole purpose of assisting defense counsel in identifying video files they may deem relevant. "   Although the Opposition emphasizes the enormous quantities of data provided, it is still not the data asked for or required. The resulting choke point (which makes an upcoming trial) impossible was an elective choice by the Government. [4]

44) Furthermore, the Prosecution continues in the mistaken belief that the Relativity system is at all functional and can be used to access this information.  The fact that perhaps data is loaded through the back of Relativity does not mean it is accessible from the front door by users.

[5]

---

[3]     105 days equals 3 1/2 months of doing nothing else at least 8 hours a day.
[4]     If the Government in a criminal prosecution with Defendants facing 50 years in jail – essentially the rest of their lives – produces information, any defense attorney must review it. There is no speculation. .
[5]     In discussions of common interests among attorneys, other attorneys either admit they aren't even trying to access the information or can't make it work, but then fail to inform the Court of these problems.   Similarly, the Government leans upon the ability to search the databases by names or keywords.  However, this requires counsel for Defendants facing over 50 years

THEREFORE, Defendant Kenneth Harrelson respectfully requests that the Court grant his requests for production of potentially exculpatory *Brady*

Dated: August 30, 2022    RESPECTFULLY SUBMITTED
KENNETH HARRELSON, *By Counsel*
/s/ Brad Geyer

Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2022, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

/s/ Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

---

in jail to trust that the flags of names or keywords is accurate. Often they are not accurate or are incomplete.