1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3    _____

                                    )  CRIMINAL NO. CR22-00015
4    UNITED STATES OF AMERICA,       )  COURTROOM 10
                                    )  U.S. FEDERAL COURTHOUSE
5                                   )  WASHINGTON, D.C.
     VS.                            )  DECEMBER 06, 2022
6                                   )
     ROBERTO A. MINUTA; JOSEPH HACKETT; )
7    DAVID MOERSCHEL; EDWARD VALLEJO,   )
                                    )
8              DEFENDANTS.           )
     _____)

9

10                    JURY SELECTION
            BEFORE THE HONORABLE AMIT P. MEHTA
11            UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   FOR THE GOVERNMENT:    U.S. Attorney's Office
                           By:  Kathryn L. Rakoczy, Esq.
14                         By:  Jeffrey S. Nestler, Esq.
                           By:  Alexandra Hughes, Esq.
15                         By:  Louis Manzo, Esq.
                           By:  Troy Edwards, Esq.
16                         Assistants U.S. Attorney
                           601 D Street, NW
17                         Washington, D.C. 20579

18   For Defendant          Law Offices of William L. Shipley
     Roberto A. Minuta:     By:  William Shipley, Jr., Esq.
19                         P.O. Box 745
                           Kailua, Hawaii 96734
20
     For Defendant          Angela Halim, Esq.
21   Joseph Hackett:        3580 Indian Queen Lane
                           Philadelphia, Pennsylvania 19129
22

23

24

25

1    Appearances, Continued:

2    For Defendant          Brown, Suarez, Rios & Weinberg
     David Moerschel:       By:  Connor Robert Martin, Esq.
3                           1532 Jackson Street
                            Fort Myers, Florida 33901
4
                            Brown, Suarez, Rios & Weinberg
5                           By:  Scott Weinberg, Esq.
                            265 E. Marion Avenue, Suite 114
6                           Punta Gorda, Florida 33950

7    For Defendant          Clinton & Peed
     Edward Vallejo:        By:  Matthew J. Peed, Esq.
8                           1775 Eye Street, NW, Suite 1150
                            Washington, D.C. 20006
9
     COURT REPORTER:        Melanie Wilkins, RMR, CRR
10                          Official Court Reporter

11           Proceedings reported by machine stenography.

12             Transcript produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25

1          [December 06, 2022, 1:34 p.m.  The defendants are present

2      with counsel in open court.]

3          THE COURT:  Please be seated.

4          MR. SHIPLEY:  Before we have a juror come in, could

5   we be heard for just a moment?

6          THE COURT:  It's fine.  It's fine.

7          MR. SHIPLEY:  When the Court is addressing the jurors

8   about Mr. Rhodes and Oath Keepers, what they know, could the

9   Court add Alex Jones and Roger Stone?  That would prevent me

10  from needing to do -- that way, if they have some comment that

11  I think I need to come in, I can come in on, but, if they don't

12  see anything, I don't need to raise the issue.  They are

13  notorious.  They are in the news.  They are going to be

14  connected to Mr. Minuta, so I sort of need to have that

15  reaction.

16         THE COURT:  So I haven't done that purposely because

17  I believe their names were on the list of people --

18         MR. SHIPLEY:  Right.

19         THE COURT:  -- who they either would recognize or

20  not, and, unless they identify them in the -- as people whose

21  names they recognize, I didn't intend to inject those names and

22  ask them if they knew who they are.

23         MR. SHIPLEY:  They are in the news, just as much as

24  Mr. Rhodes and the Oath Keepers.  That's my whole thing.

25         THE COURT:  Okay.  It's based on news coverage, not

```
1   necessarily if they know them or don't know them, obviously.

2   Right.  I know.  We asked do you know or recognize any names of

3   the people who are listed.

4            MR. SHIPLEY:  Correct.

5            THE COURT:  And no one so far as identified either

6   Roger Stone or --

7            MR. SHIPLEY:  Alex Jones.

8            THE COURT:  -- Alex Jones.  So that's why I haven't

9   asked.

10            MR. SHIPLEY:  All right.  All right.

11            THE COURT:  I haven't gone through all of these, but

12   certainly, from past experience, we had a number of jurors

13   identify those individuals.  If they affirmatively identify, I

14   follow up, but I'm not actively soliciting to determine if they

15   know who they are.

16            MR. SHIPLEY:  Okay.  Thank you, Your Honor.

17            THE COURT:  Okay.

18            THE CLERK:  And, Your Honor, this is Juror No. 2339.

19            THE COURT:  Sir, hi.  How are you?

20            PROSPECTIVE JUROR 2339:  I'm sorry?

21            THE COURT:  Hi.  How are you?

22            PROSPECTIVE JUROR 2339:  Should I sit, stand?

23            THE COURT:  Please have a seat.  Feel free to remove

24   your mask, if you are comfortable doing so.

25            PROSPECTIVE JUROR 2339:  What are you comfortable
```

```
1   with?

2             THE COURT:  I'm comfortable with you having your mask

3   off.  That's fine.  You are Juror 2339; is that right?

4             PROSPECTIVE JUROR 2339:  Yes, it is.

5             THE COURT:  Okay.  So you have answered a number of

6   questions -- the questionnaire is front of you.  You answered

7   the hardship questions.  You indicated you are a father of a

8   newborn.

9             PROSPECTIVE JUROR 2339:  I have a

10  two-month-old.

11            THE COURT:  Congratulations.

12            PROSPECTIVE JUROR 2339:  Thank you.  I am very, very

13  grateful.  I am very, very tired all of the time.  And we have

14  no family here, so this is a hardship.

15            THE COURT:  Let me ask you this:  Do you say you are

16  going back home to Chicago --

17            PROSPECTIVE JUROR 2339:  Yes.

18            THE COURT:  -- on December 21$^{st}$?  Is that -- I take

19  it that is for the holidays?

20            PROSPECTIVE JUROR 2339:  That is for the holidays.

21  That is for family.

22            THE COURT:  When are you returning?

23            PROSPECTIVE JUROR 2339:  December 28$^{th}$, 29$^{th}$.

24            THE COURT:  And, in terms of your new son or

25  daughter, is there someone who takes care of the child during
```

```
 1   the day or is that you?

 2              PROSPECTIVE JUROR 2339:  My wife and I do.  We have a

 3   three-year-old as well, so we are very, very tired.  One is

 4   always dealing with one of them.  So as soon as I dropped off

 5   my oldest, I came here.  As soon as I leave here, I'm going to

 6   deal with my youngest and then my oldest when he gets out of

 7   school.

 8              THE COURT:  Let me ask the following --

 9              PROSPECTIVE JUROR 2339:  Sure.

10              THE COURT:  -- which is Question 12 indicates that

11   you indicated that your wife has been in the media.  She works

12   for NPR.

13              PROSPECTIVE JUROR 2339:  Yes, covering Congress.

14              THE COURT:  Yes.  And so has she done stories or done

15   reporting on --

16              PROSPECTIVE JUROR 2339:  Yes.

17              THE COURT:  -- January 6th?

18              PROSPECTIVE JUROR 2339:  Yes.  Her office is in the

19   Capitol.

20              THE COURT:  Okay.  Was she at the Capitol --

21              PROSPECTIVE JUROR 2339:  Thank God, no.  But good

22   friends were.

23              THE COURT:  Hang on.  You have to let me finish --

24              PROSPECTIVE JUROR 2339:  Understood.  I apologize.

25              THE COURT:  She was not on the Capitol on
```

1    January 6th?

2         PROSPECTIVE JUROR 2339:  No.

3         THE COURT:  Have you discussed the events of

4    January 6 --

5         PROSPECTIVE JUROR 2339:  Yes.

6         THE COURT:  -- in connection with her reporting the

7    events of that day?

8         PROSPECTIVE JUROR 2339:  Yes.

9         THE COURT:  Any objection, counsel?

10        MR. EDWARDS:  No, Your Honor.

11        MR. WEINBERG:  No, Your Honor.

12        MR. SHIPLEY:  No, Your Honor.

13        THE COURT:  Thank you very much.  Good luck with your

14   newborn and your child rearing.  Thank you.

15        PROSPECTIVE JUROR 2339:  Good luck to you.

16     [Prospective Juror 2339 exits.]

17        THE COURT:  He was anxious to answer my questions or

18   anxious to get out of here or both.

19        THE CLERK:  And, Your Honor, this is Juror No. 1637.

20        THE COURT:  Good afternoon.  Welcome.  Thank you.

21   You are Juror 1637?

22        PROSPECTIVE JUROR 1637:  Yes.

23        THE COURT:  All right.  So you answered some of the

24   questions yes.  So let's start with No. 1, which is the

25   hardship question, which indicates you will be out of the

```
1    country on December the 19th and 20th; is that right?

2              PROSPECTIVE JUROR 1637:  Yes, sir.

3              THE COURT:  Okay.  And can I just ask, you say you'll

4    be back on Tuesday in the morning?

5              PROSPECTIVE JUROR 1637:  Yes.

6              THE COURT:  Is this something that's already prepaid?

7              PROSPECTIVE JUROR 1637:  Yeah.

8              THE COURT:  Okay.  And is it -- I'm not trying to

9    pry, but is it personal reasons, business reasons?

10             PROSPECTIVE JUROR 1637:  My best friend's birthday.

11             THE COURT:  What's that?

12             PROSPECTIVE JUROR 1637:  My best friend's birthday.

13             THE COURT:  Okay.  When does your car, plane fly out?

14             PROSPECTIVE JUROR 1637:  On that Saturday, the 16th

15   or 17th.

16             THE COURT:  On the 17th and returning on the

17   20th.

18             Okay.  All right.  Why don't we turn to some other

19   questions first.  So why don't you turn to page 11 for me,

20   please.  And Questions 49 and 50.  Question 49 asked whether

21   you've read, seen, or heard anything about the Oath Keepers

22   organization, and you answered no.  Is the answer to that

23   question still "no" today?

24             PROSPECTIVE JUROR 1637:  No.

25             THE COURT:  It's no longer "no" or you do -- or the
```

1   answer is the same?

2           PROSPECTIVE JUROR 1637:  The answer is the same.

3           THE COURT:  The answer is the same.

4           Same thing with respect to having seen or read

5   anything or heard anything about Stewart Rhodes, Kelly Meggs,

6   or is your answer still the same?

7           PROSPECTIVE JUROR 1637:  Still the same.

8           THE COURT:  You were asked some questions, 41, 42,

9   43.  Those were geared to try and figure out to determine how

10  much news media you've been exposed to about the events of

11  January 6.  You indicated no videos, no news, you know, live or

12  otherwise; is that right?

13          PROSPECTIVE JUROR 1637:  That's correct.

14          THE COURT:  Okay.  And so have you watched no -- have

15  you not read or seen any news about the events of January 6 at

16  the Capitol?

17          PROSPECTIVE JUROR 1637:  No.

18          THE COURT:  At all?

19          PROSPECTIVE JUROR 1637:  At all.

20          THE COURT:  Do you know what happened that day?

21          PROSPECTIVE JUROR 1637:  No.  I probably was at work

22  or school.

23          THE COURT:  Okay.  So, on January 6, 2021, do you

24  have any idea or any knowledge of what happened at the U.S.

25  Capitol on that day?

```
 1                PROSPECTIVE JUROR 1637:  No.

 2                THE COURT:  Okay.  I have to ask you to turn to

 3      page 7, which is page 3 of what you have before you.

 4      Question 21 indicates that you've been on the Capitol grounds

 5      or inside the Capitol building.  Can you tell us about that.

 6                PROSPECTIVE JUROR 1637:  Yes, on school trips or high

 7      school like a year or two ago.  I graduated in 2020.  So we did

 8      college trips and went to the Capitol as well.  I think that's

 9      it.

10                THE COURT:  Just visiting as a tourist essentially?

11                PROSPECTIVE JUROR 1637:  Yeah.

12                THE COURT:  On page 12, Question 59 asks whether you

13      or a close friend or family member has ever been the victim of

14      a crime that was reported or not, and you answered yes.  Can

15      you tell us about that.

16                PROSPECTIVE JUROR 1637:  My brother was shot.

17                THE COURT:  I'm sorry.  Who was?

18                PROSPECTIVE JUROR 1637:  My brother.

19                THE COURT:  Your brother.  So sorry.

20                PROSPECTIVE JUROR 1637:  He was in a car when he was

21      at a red light.

22                THE COURT:  At a red light?

23                PROSPECTIVE JUROR 1637:  Yeah.

24                THE COURT:  Was that in the District or somewhere

25      else?
```

1          PROSPECTIVE JUROR 1637:  D.C., up Hillcrest.  I think

2    it was -- in the year 2021, August.  He was 17.

3          THE COURT:  Was anybody arrested in connection with

4    that?

5          PROSPECTIVE JUROR 1637:  They got arrested this year.

6          THE COURT:  This year?

7          PROSPECTIVE JUROR 1637:  Yeah.

8          THE COURT:  And are the defendants still pending

9    trial in that case?

10          PROSPECTIVE JUROR 1637:  I believe so.

11          THE COURT:  And were you a witness to that offense at

12    all?

13          PROSPECTIVE JUROR 1637:  No.  We just seen videos of

14    it.

15          THE COURT:  Just seen videos of it.  Have you had

16    personal experience with the Metropolitan Police Department in

17    connection with that case?

18          PROSPECTIVE JUROR 1637:  No.

19          THE COURT:  How about the U.S. Attorney's Office or

20    the district attorney?

21          PROSPECTIVE JUROR 1637:  No.

22          THE COURT:  Is there anything -- again, I'm really

23    sorry to have to hear this.  Is there anything about that

24    experience that your brother had that would cause you to think

25    you could not be fair in this case?

1          PROSPECTIVE JUROR 1637:  No.

2          THE COURT:  You also answered Question 60, and maybe

3   it's the same question -- answer, which is you, close friend,

4   or family member been a witness to a crime.  Is that a

5   different answer or the same answer we've just been talking

6   about?

7          PROSPECTIVE JUROR 1637:  Same answer, different

8   story.

9          THE COURT:  Different story.  So when you say

10  "different story," what do you mean?

11         PROSPECTIVE JUROR 1637:  I came to a funeral.  We had

12  been to the house that the friend was, and the house was shot

13  at.

14         THE COURT:  So a funeral for --

15         PROSPECTIVE JUROR 1637:  My great grandmother's

16  funeral.

17         THE COURT:  And the house was shot during --

18         PROSPECTIVE JUROR 1637:  During repast.

19         THE COURT:  During the repast.  And was anybody hurt?

20         PROSPECTIVE JUROR 1637:  No.

21         THE COURT:  Was there any report?

22         PROSPECTIVE JUROR 1637:  A police report from my

23  aunt.

24         THE COURT:  Was anybody arrested?

25         PROSPECTIVE JUROR 1637:  No.

1          THE COURT:  And anything about that experience that

2    would cause you to not be fair and impartial in this case?

3          PROSPECTIVE JUROR 1637:  No.

4          THE COURT:  Any reason to think that that would cause

5    you to not be able to be fair to the defendants in this case?

6          PROSPECTIVE JUROR 1637:  No.

7          THE COURT:  And then 62 asks whether you or a close

8    friend or family member have been arrested, charged,

9    prosecuted, or convicted of a crime.

10         PROSPECTIVE JUROR 1637:  Yes.

11         THE COURT:  Okay.  Can you tell us about that.

12         PROSPECTIVE JUROR 1637:  My cousin got locked up for

13   murder.

14         THE COURT:  Murder?

15         PROSPECTIVE JUROR 1637:  Yes.  He's not coming home.

16         THE COURT:  I'm sorry?

17         PROSPECTIVE JUROR 1637:  He's not coming home.

18         THE COURT:  He's not coming home.  Was that there in

19   D.C. or somewhere else?

20         PROSPECTIVE JUROR 1637:  D.C. Saratoga.

21         THE COURT:  Were you close with your cousin?

22         PROSPECTIVE JUROR 1637:  No.

23         THE COURT:  All right.  And were you in any way

24   affiliated with or related to the case concerning your cousin?

25         PROSPECTIVE JUROR 1637:  No.

1          THE COURT:  Anything about his experience that might

2    cause you to think you couldn't be fair to the Government in

3    this case?

4          PROSPECTIVE JUROR 1637:  No.

5          THE COURT:  Or to the defense?

6          PROSPECTIVE JUROR 1637:  No.

7          THE COURT:  Okay.  All right.  Any follow-up from the

8    Government?

9          MR. EDWARDS:  No, Your Honor.

10          MR. WEINBERG:  Yes, Your Honor.

11          Just to be clear, you said your great grandmother's

12    funeral after your brother was shot.  Do you have an opinion

13    about firearms?

14          PROSPECTIVE JUROR 1637:  My opinion, no, because my

15    uncle works for the F.B.I. on my father's side.  And my

16    mother's side of the family do what they want to do.  So I

17    don't have no opinion whatsoever.

18          MR. WEINBERG:  So you wouldn't hold it against

19    anybody if they possessed a firearm legally?

20          PROSPECTIVE JUROR 1637:  No.

21          MR. WEINBERG:  You said your uncle was an F.B.I.

22    agent?

23          PROSPECTIVE JUROR 1637:  Yeah, on my father side.  I

24    just met him about 10 years ago because he was adopted.

25          MR. WEINBERG:  Do you guys ever talk about his job?

1        PROSPECTIVE JUROR 1637:  No, because he retired.  He

2  works as an engineer.

3        MR. WEINBERG:  No others.

4        THE COURT:  One quick follow-up.  You said your uncle

5  was with the F.B.I. or worked with the F.B.I.  Do you know

6  where he works?

7        PROSPECTIVE JUROR 1637:  No, 'cuz he lives in

8  Delaware, and I live in D.C.

9        THE COURT:  So, to your knowledge, either he was

10  retired or had nothing to do with the events of January 6th in

11  investigating that case?

12        PROSPECTIVE JUROR 1637:  It's been 3 to 4 years now.

13        THE COURT:  Thank you very much.  I'll give you some

14  further instructions as we move forward.

15     [Prospective Juror 1637 exits.]

16        THE COURT:  So I'm not going to excuse her just yet.

17  Let's see if we can get to the qualifying number.  We should be

18  able to.  But if we do get to a qualifying number, then we'll

19  excuse her.

20        MR. EDWARDS:  Thank you, Your Honor.

21        THE CLERK:  Your Honor, this is Juror No. 1421.

22        THE COURT:  Sir, how are you?

23        PROSPECTIVE JUROR 1421:  All right.

24        THE COURT:  You are Juror 1421?

25        PROSPECTIVE JUROR 1421:  Yes.

1          THE COURT:  Feel free to remove your mask, if you are

2     comfortable doing so.

3          Your juror questionnaire should be there in front of

4     you, and I'll ask you if you'll turn to page 11 first and turn

5     to Question 49.  You were asked whether you've read, seen, or

6     heard anything about the Oath Keepers organization.  And then,

7     in question 51, you were asked whether you had read, seen, or

8     heard anything about Stewart Rhodes, Kelly Meggs and some

9     others.  Can you tell us what you have read, seen, or heard

10    about the Oath Keepers or any of those individuals?

11         PROSPECTIVE JUROR 1421:  I've read in the news tied

12    to the events on January 6, and, on those particular names, I

13    think it was something in the headlines.  I can't recall or

14    not.

15         THE COURT:  Okay.  So, with respect to the first

16    thing that you mentioned, you said -- I thought you said you

17    thought you had read something or seen something in the news

18    about the Oath Keepers and January 6; is that right?

19         PROSPECTIVE JUROR 1421:  Yes.

20         THE COURT:  Do you remember anything specifically

21    about what the organization's connection is to the events of

22    January 6th?

23         PROSPECTIVE JUROR 1421:  That they were involved in

24    something on the Capitol.

25         THE COURT:  Anything more than that?  Any more detail

```
 1   than just general involvement?
 2              PROSPECTIVE JUROR 1421:  I mean, I don't know
 3   anything about the actual level, their extent of involvement.
 4              THE COURT:  Okay.
 5              PROSPECTIVE JUROR 1421:  I just know they are
 6   associated with it.
 7              THE COURT:  Okay.  And then you mentioned something
 8   about a recent headline.  Can you tell us what you think you
 9   may have -- what you recall having seen.
10              PROSPECTIVE JUROR 1421:  I think the Rhodes.  I think
11   I saw that as a trial maybe recently.
12              THE COURT:  Okay.  So, as a juror, we would ask you
13   to put aside anything that you have seen or think you know
14   about the case as well as this particular headline.  There are
15   four defendants here who will be on trial, and the evidence
16   needs to be assessed as to them individually.  Do you
17   understand that?
18              PROSPECTIVE JUROR 1421:  Yes, sir.
19              THE COURT:  And would you be able to put aside
20   whatever you think you know about the Oath Keepers organization
21   and this headline that you may have seen in passing and
22   evaluate the evidence and evaluate them separately without
23   prejudging the case?
24              PROSPECTIVE JUROR 1421:  Yes.
25              THE COURT:  All right.  Let's turn to -- I think turn
```

1  to page -- before we do that, let's turn back to page 10.  You

2  indicated on the list of names of people that we had given you

3  that you recognized or Harry Dunn.  Can you tell us what -- how

4  you know or recognize that name?

5          PROSPECTIVE JUROR 1421:  I believe he's one of the

6  officers that testified in the January 6 committee hearings in

7  that matter.

8          THE COURT:  Do you recall watching his testimony?

9          PROSPECTIVE JUROR 1421:  Yeah, I did.  Yeah.  And

10  some of the interviews after that.

11          THE COURT:  You saw the interviews after that?

12          PROSPECTIVE JUROR 1421:  Yeah.

13          THE COURT:  So let me ask you this:  If Officer Dunn

14  were to testify in this case -- and I don't know whether he

15  will or not -- if he were to testify in this case, do you think

16  you could set aside what you saw in his testimony outside of

17  the courtroom?

18          PROSPECTIVE JUROR 1421:  Yes.

19          THE COURT:  And could you evaluate his testimony

20  based on what he says in the courtroom and the other evidence

21  that's presented in the case?

22          PROSPECTIVE JUROR 1421:  Yes.

23          THE COURT:  And if you thought that Officer Dunn had

24  made statements that were not consistent with what you had

25  heard, say, previously, again, could you only focus on what was

1    presented in this case?

2            PROSPECTIVE JUROR 1421:  Yes.

3            THE COURT:  All right.  You also have indicated in

4    Question 41 that you have seen a lot of videos, that you

5    watched live news coverage of the events of January 6 -- this

6    is Question 42.  And then indicated in Question 43, a lot of

7    news coverage about it.

8            Could you just describe for us generally how you are

9    a consumer of news with respect to January 6?  In other words,

10   did you review more of it at the time and it kind of tapered

11   off, or are you continuing to be actively looking for news of

12   that day?

13           PROSPECTIVE JUROR 1421:  I mean, I watched it at the

14   time because it was major breaking news.  I still see it, you

15   know, pretty regularly.  I read a lot of news, mostly like

16   headlines.  So, I guess, it's tapered relatively, but still

17   pretty relevant.

18           THE COURT:  Based upon what you said and seen

19   recently before, do you have an opinion about people who were

20   at the Capitol on January 6 and whether or not they committed

21   any crimes?

22           PROSPECTIVE JUROR 1421:  So do I have an opinion

23   about whether or not they committed any crimes?

24           THE COURT:  Correct.

25           PROSPECTIVE JUROR 1421:  I mean, probably, yes, but,

1    you know, it's up to whatever the evidence says.

2              THE COURT:  Okay.  So that was my follow-up question,

3    is that, even though you may have this general impression,

4    could you set that aside and evaluate the evidence that's

5    presented in this case?

6              PROSPECTIVE JUROR 1421:  Yes.

7              THE COURT:  And if you were to come to the conclusion

8    that the Government had not met its burden of proof in this

9    case, that is, proof beyond a reasonable doubt, would you have

10   any difficulty acquitting these defendants?

11             PROSPECTIVE JUROR 1421:  No.

12             THE COURT:  All right.  Anything else?  Let me ask

13   you Question 46.  You had indicated that you listened to or

14   attended or viewed January 6 committee hearings that were

15   before Congress?  Can you tell us what you had seen or read

16   about those hearings.

17             PROSPECTIVE JUROR 1421:  I watched a couple of -- not

18   all of them, but the replays after that, some of the original

19   ones, like the first three, I believe.  And then I've seen some

20   of the follow-up news stories and headlines on them.

21             THE COURT:  Do you recall, based upon what you

22   viewed, whether there was any discussion about the Oath Keepers

23   during the January 6 committee hearings?

24             PROSPECTIVE JUROR 1421:  I think there was one of

25   them, yes.  I remember seeing some content about that, but I

85

1    can't remember which one.

2            THE COURT:  Do you recall what that content was?

3            PROSPECTIVE JUROR 1421:  Not really.  I think it

4    was -- I'm trying to think because they had kind of different

5    themes for each one.  I think one was more about the actual

6    events of that day, and some of them were events that happened

7    at the Capitol.  So I think it was related to that testimony.

8            THE COURT:  So, in terms of specific recollection of

9    what you -- what you recall the January 6 committee hearing

10   saying or presenting about the Oath Keepers, is it fair to say

11   you don't have any specific memory of what was presented by the

12   committee by the Oath Keepers?

13           PROSPECTIVE JUROR 1421:  No.  I don't remember

14   specifics.

15           THE COURT:  Are you left with any sort of general

16   impressions about the organization based upon the January 6

17   committee hearings?

18           PROSPECTIVE JUROR 1421:  Not really, no.

19           THE COURT:  All right.  Let me turn to -- page 7,

20   please.  Question 16 asks have you or a close friend or family

21   member been employed by the federal government.  Could you tell

22   us about that.

23           PROSPECTIVE JUROR 1421:  Yes.  I work for the

24   Government.

25           THE COURT:  Can you tell us in what capacity?

1          PROSPECTIVE JUROR 1421:  Analyst.

2          THE COURT:  For which agency?

3          PROSPECTIVE JUROR 1421:  DOD.

4          THE COURT:  And, in your capacity as an analyst for

5     DOD, do you have any interaction with the enforcement or --

6     enforcement arms of the Department of Defense?

7          PROSPECTIVE JUROR 1421:  No.  I work in foreign -- I

8     do foreign threats.  Nothing with law enforcement or any

9     domestic.

10          THE COURT:  So foreign threats, foreign intelligence,

11     that kind of thing?

12          PROSPECTIVE JUROR 1421:  Yeah.

13          THE COURT:  Okay.  You indicated in Question 18, have

14     you -- well, let me back up.  One of the questions -- excuse

15     me.  One of the allegations in this case is that the defendants

16     forcibly resisted the authority of the United States.  Do you

17     think that your job at the Department of Defense would prevent

18     you from being fair and impartial to a defendant who has been

19     accused of such an offense?

20          PROSPECTIVE JUROR 1421:  Accused, it's up to the

21     evidence.

22          THE COURT:  It's up to the evidence.  So you could be

23     fair and impartial and view the evidence despite your position

24     at the Department of Defense?

25          PROSPECTIVE JUROR 1421:  Yes.

1          THE COURT:  Question 18 asks have you or a close

2     friend or family member ever served in the armed forces.  Can

3     you tell us about this?

4          PROSPECTIVE JUROR 1421:  I served and so did my

5     daughter.

6          THE COURT:  Can you tell us which branches?

7          PROSPECTIVE JUROR 1421:  Army and Marines.

8          THE COURT:  Question 20 asks whether you, close

9     friend, or family member in the last 5 years have attended a

10    rally, protest, or demonstration.  Can you tell us about why

11    you answered that question yes.

12         PROSPECTIVE JUROR 1421:  Yeah.  My wife is pretty

13    active in a lot of different things.  So things like most

14    recently the Iranian protests outside of the state department

15    raising awareness and stuff like that.

16         THE COURT:  Anything else that you can remember?

17         PROSPECTIVE JUROR 1421:  So she is Afghan descent.

18    So raising awareness for things going on in Afghanistan.

19         THE COURT:  So it's not my expectation that anything

20    touching on international affairs would be the subject of this

21    trial.  That said, if you were to learn at some point during

22    the course of the trial that the defendants held political

23    views different than your own, do you think you could be fair

24    and impartial to them?

25         PROSPECTIVE JUROR 1421:  Yes.

1          THE COURT:  If you learned that they have political

2    views different than your wife's political views, can you be

3    fair and impartial to them?

4          PROSPECTIVE JUROR 1421:  Yes.

5          THE COURT:  You've indicated on Question 21 that you

6    have been on the Capitol grounds or inside the Capitol

7    building.  Can you tell us about that?

8          PROSPECTIVE JUROR 1421:  Yeah.  Tour with my family

9    when they came to town a few years ago.

10          THE COURT:  So you were there as a tourist but not in

11   any professional capacity?

12          PROSPECTIVE JUROR 1421:  No.

13          THE COURT:  All right.  If you will please turn back

14   to page 11.  You answered Question 56, which asks whether you

15   or a close friend or family member has ever applied for

16   employment with or employed by local, state, or federal law

17   enforcement.  Can you tell us about that, sir.

18          PROSPECTIVE JUROR 1421:  I worked for the State of

19   Georgia, and both my parents worked for the state of Georgia.

20          THE COURT:  And was that in a --

21          PROSPECTIVE JUROR 1421:  Law enforcement.  Sorry, I

22   apologize.  Yeah.  My dad was law enforcement.

23          THE COURT:  And in what capacity?

24          PROSPECTIVE JUROR 1421:  Department of Probation.

25          THE COURT:  Department of Probation.  So he was a

```
1   probation officer?

2              PROSPECTIVE JUROR 1421:  Yes.

3              THE COURT:  Okay.  Gotcha.  Any reason to think that

4   your father's work as a probation officer would cause you to

5   have you view one way or the other about anybody who is a

6   defendant in the case?

7              PROSPECTIVE JUROR 1421:  No.

8              THE COURT:  All right.  Okay.  That's all I have.

9              Any follow-up questions from the Government?

10             MR. EDWARDS:  No, Your Honor.

11             THE COURT:  Anything from the defense?

12             MR. SHIPLEY:  Mr. [redacted] --

13             THE COURT:  I just ask that you not name the jurors.

14  I ask that it be stricken from the record.  Just refer by jury

15  number.

16             MR. SHIPLEY:  Sir, you've never heard -- or you had

17  no information about the Oath Keepers prior to January 6.

18  That's information that's only come to you through press

19  reporting; correct?

20             PROSPECTIVE JUROR 1421:  Yes.

21             MR. SHIPLEY:  Okay.  Based on what you have learned

22  and what you're hearing through other news sources, how would

23  you describe that organization based on the little bit that you

24  know?

25             PROSPECTIVE JUROR 1421:  So activists.  And, I guess,
```

1  they were against the results of the 2020 election.  That's all

2  I know associated based on what I have seen.

3        MR. SHIPLEY:  Now, you indicated you have watched a

4  couple of the January 6th committee hearings.  Did you seek

5  those out?  I mean, did you know those were coming on, and you

6  purposely set down to watch?

7        PROSPECTIVE JUROR 1421:  Yeah.  I couldn't see them

8  live.  I was at work.  So I watched them after.

9        MR. SHIPLEY:  Okay.  But that was something you saw

10 after?

11        PROSPECTIVE JUROR 1421:  Yes.

12        MR. SHIPLEY:  It wasn't something in the background

13 on TV and you saw it and sat down and watch it?

14        PROSPECTIVE JUROR 1421:  Yes, I sought it out.

15        MR. SHIPLEY:  The same thing with regard to consuming

16 news on the Internet.  You seek out news on the Internet that

17 interests you?

18        PROSPECTIVE JUROR 1421:  Yeah.  I'm an avid news

19 reader, yes.

20        MR. SHIPLEY:  And January 6 and the aftermath and

21 legal proceedings and whatnot, those are things you have sought

22 information of?

23        PROSPECTIVE JUROR 1421:  Mostly foreign events, but

24 that pops up in a lot of news feeds.

25        MR. SHIPLEY:  That would primarily be on the

1  Internet?

2          PROSPECTIVE JUROR 1421:  Yes.

3          MR. SHIPLEY:  That includes YouTube looking at events

4  of the day?

5          PROSPECTIVE JUROR 1421:  Yes.  That's how I watched

6  the January 6 hearings was on YouTube.

7          MR. SHIPLEY:  That includes videos showing violence

8  on the Capitol grounds on January 6?

9          PROSPECTIVE JUROR 1421:  If they are contained in the

10  hearings, yes.  I don't watch YouTube outside of anything like

11  that.

12          MR. SHIPLEY:  Okay.  Thank you.

13          THE COURT:  Any follow-up, Mr. Peed?

14          MR. PEED:  Do you think you'd be able to given what

15  you have seen so far -- you sort have some knowledge about the

16  incident that day.  I know you said that you would be fair to

17  the evidence, but part of your job is also to apply a

18  presumption of innocence.  Do you think you could come in sort

19  of with that level of freshness, that it's presumed in a sense

20  as you are looking at the evidence?

21          PROSPECTIVE JUROR 1421:  Yes.  That's my duty as a

22  juror in the American judicial system, yes.

23          MR. PEED:  Do you think if you are picked to be a

24  juror in this case and it's going on a while, friends and

25  family sort of hear you are on this case, do you think you

1    would get any pressure this from them?  Would that sway you?

2    Do you think if you found for the defense, for example, that

3    you would have to defend yourself or explain it or do you think

4    it wouldn't be much pressure.

5              PROSPECTIVE JUROR 1421:  I won't tell anybody.

6    Nobody knows what I do for a living.

7              MR. PEED:  That makes a lot of sense.  Thank you.

8              THE COURT:  All right.

9              MR. EDWARDS:  Nothing.

10             THE COURT:  Thank you.

11        [Prospective Juror 1421 exits.]

12             MR. SHIPLEY:  Your Honor, I would challenge the juror

13   for cause on the basis that he obviously consumes a lot of

14   news.  It's something he does on a regular basis.  He sought

15   out the J6 committee hearings.  It's really impossible for us

16   to discern at this point how much he already knows and the

17   sources that he's learned it from.

18             I take him at his word that he believes he could set

19   it all aside, but we don't really have any real firm basis to

20   know how much he's already sort of internalized the events

21   based on his own, sort of, admitted continuous news sources.

22             THE COURT:  So I won't grant the request to strike

23   for cause because he was asked a number of times what the

24   extent of his knowledge is and, particularly, with respect to

25   the Oath Keepers, you asked him specifically what he understood

1    about the organization.  And, you know, he clearly had very

2    limited understanding of the organization and its role in the

3    events that day.

4           The fact he sought out even watching the January 6

5    committee hearings, that in and of itself isn't disqualifying.

6    Many Americans sought out and watched the January 6 committee

7    hearings, and I don't think that disqualifying.

8           With each turn, he was asked whether he could put

9    aside what he may have learned or heard about the events of

10   that day, and he said he could.  He's credible, and he's

11   forthright.  And I have very little reason to think he would

12   not be able to put aside what he's learned as he said he would

13   be able to do.  All right.

14          THE CLERK:  Your Honor, this is Juror 0679.

15          THE COURT:  How are you?

16          PROSPECTIVE JUROR 0679:  I'm well.  How are you?

17          THE COURT:  Good welcome.  You are Juror 0679?

18          PROSPECTIVE JUROR 0679:  Yes.

19          THE COURT:  Your juror questionnaire is in front of

20   you there.  Let me ask you if you would, please, for you to

21   turn to the second page of the questionnaire, which is

22   Question -- page 6 at the bottom, Question 12.  We had asked

23   you whether there's anything you ought to make us aware of that

24   would affect your ability to be fair and impartial, and you

25   wrote I don't believe that I have the power or authority to

1    judge any human being's fate.  I don't agree with the actions

2    that took place at the Capitol on 1/6/2021.  It was not a

3    peaceful protest, which led to destruction and disorder.

4            So let me ask you about the first part of that

5    answer, that is, you indicate that you don't think you have the

6    power and authority to judge people.  Can you share with us

7    what you mean by that?

8            PROSPECTIVE JUROR 0679:  Certainly.  I believe the

9    higher power has the decision to one's fate, not myself.

10            THE COURT:  Okay.  So how does that view -- we all

11    have various understandings of theology, religion, what have

12    you.  How would that affect your ability as a civilian to come

13    in and evaluate evidence and apply it against the law that I

14    would instruct you?

15            PROSPECTIVE JUROR 0679:  I believe that my response

16    would remain neutral.

17            THE COURT:  When you say neutral, what do you mean?

18            PROSPECTIVE JUROR 0679:  I really don't have any

19    opinion.

20            THE COURT:  You wouldn't have an opinion?

21            PROSPECTIVE JUROR 0679:  To make a decision.

22            THE COURT:  So if you were selected, you believe that

23    you would not be able to form an opinion about guilt or -- or

24    whether somebody is guilty or not guilty of what they have been

25    charged with?

```
 1              PROSPECTIVE JUROR 0679:  Correct.
 2              THE COURT:  And I understand that you also do not
 3    think that you would be able to deliberate, that is, have a
 4    conversation with your fellow jurors about that important
 5    decision?
 6              PROSPECTIVE JUROR 0679:  Correct.
 7              THE COURT:  Okay.  Any objections, counsel?
 8              MR. EDWARDS:  No, Your Honor.
 9              MR. SHIPLEY:  No, Your Honor.
10              THE COURT:  Mr. Douyan will show you out of the
11    courtroom and provide you with an instruction.
12         [Prospective Juror 0679 exits.]
13              THE COURT:  Sorry.  So Juror 679 is stricken for
14    cause based on her responses.
15              THE CLERK:  Your Honor, this is Juror No. 2357.
16              THE COURT:  Ma'am, how are you?
17              PROSPECTIVE JUROR 2357:  Great.  How are you?
18              THE COURT:  Good.  Thank you.  Please have a seat.
19    If you'll remove your mask if you are comfortable doing so.
20              All right.  So your juror questionnaire is in front
21    of you.  So if you could please first turn to page 11 and
22    Question 49.
23              PROSPECTIVE JUROR 2357:  Okay.
24              THE COURT:  All right.  Question 49 asks have you
25    read, seen, or heard anything about the Oath Keepers
```

```
1    organization.  Can you tell us what you have read, seen, or

2    heard?

3              PROSPECTIVE JUROR 2357:  I think they are a white

4    supremacist organization.

5              THE COURT:  Okay.  What's your basis for that belief?

6              PROSPECTIVE JUROR 2357:  Just whatever the news over

7    the years, last several years.

8              THE COURT:  And let me ask you this:  Would you -- do

9    you think that that impression is something that would make it

10   difficult for you to sit fairly and impartially in this case?

11             PROSPECTIVE JUROR 2357:  No.

12             THE COURT:  Do you think you could -- would you be

13   open to hearing evidence that that, in fact, is not fair and an

14   accurate depiction of the organization?

15             PROSPECTIVE JUROR 2357:  Sure.  Yes.

16             THE COURT:  Okay.  And would you hold it against

17   these defendants that you may have read or some reporter or

18   someone else has suggested or characterized the group in the

19   way you just said?

20             PROSPECTIVE JUROR 2357:  No.

21             THE COURT:  Do you think -- is there any doubt in

22   your mind that you would be able to put that impression aside

23   and evaluate the evidence that's presented in this case?

24             PROSPECTIVE JUROR 2357:  No.

25             THE COURT:  Any doubt that you could not be fair and
```

1  impartial to these defendants based upon that impression that

2  you have?

3          PROSPECTIVE JUROR 2357:  No.

4          THE COURT:  All right.  Let me ask you if you would

5  please go to the previous page.  We asked you about some

6  videos, watched news, read news about the events of January 6.

7  Can you give us a sense of -- the extent to which you consumed

8  news about the events of that day.

9          PROSPECTIVE JUROR 2357:  Well, I think, on that day,

10 I was at work, that, you know, I had it streaming in the corner

11 of my screen.  So I wasn't really watching it that closely, and

12 then I read the news stories after.

13         THE COURT:  Okay.  And would you say that you have

14 continued to consume news about the events of January 6, or

15 would you say that it's decreased and you may read it from time

16 to time?

17         PROSPECTIVE JUROR 2357:  I would say time to time.

18         THE COURT:  And so would you agree with me if I said

19 that you are not somebody that actively seeks out the events of

20 January 6?

21         PROSPECTIVE JUROR 2357:  No, I don't.

22         THE COURT:  As a juror, we would ask you to put to

23 the side anything that you have read or learned about the

24 events of that day.  Is that something that you think you could

25 do?

```
 1              PROSPECTIVE JUROR 2357:  Yes.

 2              THE COURT:  Let me ask you:  Based upon the news that

 3   you have consumed, do you have any other impressions or

 4   understanding of the Oath Keepers organization?

 5              PROSPECTIVE JUROR 2357:  No.  I don't know much about

 6   them.

 7              THE COURT:  Do you have any impression about what, if

 8   any, role they played on January 6?

 9              PROSPECTIVE JUROR 2357:  Just that they were

10   involved.

11              THE COURT:  That's all you know?  Nothing more than

12   that?

13              PROSPECTIVE JUROR 2357:  No, I didn't follow the

14   recent news.

15              THE COURT:  Question 46 asks the extent to which you

16   have attended, viewed, or listened to any portion of the

17   January 6 committee hearings.  Can you tell us what you viewed

18   or listened to?

19              PROSPECTIVE JUROR 2357:  I listened or watched some

20   of them while I was doing other things, so I wasn't, like,

21   fully committed.  I was kind of in and out.

22              THE COURT:  And, based upon what you saw, do you have

23   any recollection of those hearings touching on or discussing

24   the Oath Keepers?

25              PROSPECTIVE JUROR 2357:  I know they touched on it,
```

1    but I think the day that they focused on it, I did not watch.

2            THE COURT:  So do you recall watching anybody

3    testifying about the organization?

4            PROSPECTIVE JUROR 2357:  I don't remember, no.

5            THE COURT:  Or any presentation of evidence about the

6    organization or commentary about the organization from them?

7            PROSPECTIVE JUROR 2357:  No.

8            THE COURT:  What you have learned about the January 6

9    hearings, can you put that aside and only focus on the evidence

10   presented in this case?

11           PROSPECTIVE JUROR 2357:  Yes.

12           THE COURT:  Okay.  All right.  So if I can ask you,

13   please, to turn to page 7, Question 16, and it asks whether

14   you, a close friend, or family member has been employed by the

15   federal government.  Can you tell us about that?

16           PROSPECTIVE JUROR 2357:  Yes.  I'm an anthropologist

17   with the Smithsonian.  My sister is a budget analyst at the

18   F.B.I., and my father -- well, first, he was -- he had a

19   military career, and then he went into the civil service.

20           THE COURT:  So your family clearly has employment and

21   service with the federal government.  One of the allegations in

22   this case is that the defendants used -- excuse me -- tended to

23   resist the authority of the United States through its

24   government and government through force.  Is the fact that you

25   work for or your family members worked for and served the

1    United States government, would that affect your ability to be

2    fair and impartial?

3              PROSPECTIVE JUROR 2357:  No.

4              THE COURT:  And, Question 18, you said that you did

5    have a close friend or family member in the armed forces.

6              PROSPECTIVE JUROR 2357:  My father.

7              THE COURT:  Can you tell us what branch he served in.

8              PROSPECTIVE JUROR 2357:  He was Army, and he worked

9    in communications.

10             THE COURT:  Okay.  And Question 26 asks whether you

11   ever served on a jury before, and you indicated twice before in

12   criminal cases and those juries reached verdicts?

13             PROSPECTIVE JUROR 2357:  Yes.

14             THE COURT:  And anything about your jury experience

15   that would cause you to think you would have difficulty serving

16   in this case?

17             PROSPECTIVE JUROR 2357:  No.

18             THE COURT:  Would you be able to set side what you

19   have learned about the criminal justice system and about

20   criminal law and follow the instructions as I gave them to you?

21             PROSPECTIVE JUROR 2357:  Yes.

22             THE COURT:  If you would turn to page 11, please,

23   Question 56.  And I think we know the answer to this, perhaps,

24   but you answered "yes" to the question of whether you, a close

25   friend, or family has ever applied for employment with or been

1    employed by local, state, or federal law enforcement.  Can you

2    tell us -- you mentioned your sister.

3              PROSPECTIVE JUROR 2357:  Yeah.  My sister works for

4    F.B.I. doing budget and policy writing.  Nothing in law

5    enforcement.

6              THE COURT:  Does she, to your knowledge, work with

7    law enforcement agents, those who are in the field

8    investigating matters?

9              PROSPECTIVE JUROR 2357:  I don't think so.  I mean,

10   she never talks about work.

11             THE COURT:  And do you know whether any of her --

12   could I ask, where does she work physically?

13             PROSPECTIVE JUROR 2357:  She's at Quantico.

14             THE COURT:  Quantico.  Do you know whether -- as part

15   of her work, has she been involved, even as a budgetary matter,

16   with respect to the investigation of the events of January 6?

17             PROSPECTIVE JUROR 2357:  I don't believe so.

18             THE COURT:  Okay.  Any follow-up from the Government?

19             MR. EDWARDS:  Good afternoon.  How are you?

20             PROSPECTIVE JUROR 2357:  Good.

21             MR. EDWARDS:  Thanks for being here.  You said you

22   were anthropologist at the museum, the Smithsonian?

23             PROSPECTIVE JUROR 2357:  Yes.

24             MR. EDWARDS:  Can you briefly describe what you do as

25   an anthropologist?

```
 1              PROSPECTIVE JUROR 2357:  I'm a physical

 2   anthropologist, so I work with human skeletal remains.

 3              MR. EDWARDS:  Is it important in that role to look at

 4   facts, kind of devoid or divorced from any emotion that you

 5   have about the subject matter?

 6              PROSPECTIVE JUROR 2357:  Yes, very much.

 7              MR. EDWARDS:  Do you think you could take -- how long

 8   have you been doing that?

 9              PROSPECTIVE JUROR 2357:  All my adult life.

10              MR. EDWARDS:  Do you think you could take that body

11   of experience that you bring in your job and apply it as a

12   juror?

13              PROSPECTIVE JUROR 2357:  Yes.

14              MR. EDWARDS:  Thank you.

15              THE COURT:  Anything from defense counsel?

16              MS. HALIM:  Good afternoon, ma'am.  Judge Mehta was

17   asking about your compunction of some news coverage, and I

18   heard you say that you hadn't followed the recent things.

19   Could I just ask you what you mean by "the recent things"?

20              PROSPECTIVE JUROR 2357:  Well, I know there was a

21   verdict in another trial, but since we were told not to consume

22   that news, I didn't pay attention to it.

23              MS. HALIM:  And then I did have one other question.

24   It's going to sound stupid.  What does "white supremacist"

25   mean?  What does that mean to you?
```

1          PROSPECTIVE JUROR 2357:  I guess that they just think

2    themselves superior to other races.

3          MS. HALIM:  Could I ask whether that, you know,

4    thinking of the Oath Keepers are a white supremacist

5    organization, can I ask where that connection was made for you?

6          PROSPECTIVE JUROR 2357:  Just over the years.  I

7    mean, I couldn't tell you.

8          MS. HALIM:  Had you heard of the Oath Keepers prior

9    to January 6 of 2021?

10         PROSPECTIVE JUROR 2357:  I think they were in the

11   news a little but nothing extensive.

12         MS. HALIM:  You've been on a couple of criminal

13   juries; correct?

14         PROSPECTIVE JUROR 2357:  Uh-huh.

15         MS. HALIM:  So you are familiar with the presumption

16   of innocence?

17         PROSPECTIVE JUROR 2357:  Yes.

18         MS. HALIM:  Are you going to have any problem or

19   difficulty applying the presumption of innocence to the

20   defendants here in this courtroom?

21         PROSPECTIVE JUROR 2357:  No, I don't think so.

22         MS. HALIM:  Thank you so much.  I appreciate that.

23         THE COURT:  Thank you.  Mr. Douyon will escort you

24   out of the courtroom.

25         [Prospective Juror 2357 exits.]

1            MR. SHIPLEY:  Your Honor, we would move to strike the

2    juror for cause based upon her preconceived belief at this

3    point that the Oath Keepers are a white supremacist

4    organization.  I think that's a steep road for us to have to

5    climb to convince her that's not the case when I think the

6    Court knows from prior testimony there's really no evidence of

7    that.

8            THE COURT:  So, you know, I'm going to deny the

9    request.  I think she had provided additional basis and

10   understanding of that belief.  Perhaps I think of it

11   differently.  It's clearly something she just read or been

12   told.  The fact that she's an anthropologist and has indicated

13   that she could look at the evidence dispassionately, which she

14   does for her job -- and we asked her any number of different

15   ways how that impression would affect her ability to be fair

16   and impartial.  I think she consistently -- in fact, she

17   consistently answered credibly that she could be fair

18   notwithstanding that impression and that she could put that

19   impression to the side.  So I'll deny the request to strike her

20   for cause.

21           THE CLERK:  Please have a seat right here and speak

22   into the microphone.  Your Honor, this is Juror No. 0853.

23           THE COURT:  Hi, ma'am.  How are you?

24           PROSPECTIVE JUROR 0853:  Good afternoon.  How are

25   you?

1          THE COURT:  You are 0853?

2          PROSPECTIVE JUROR 0853:  That is correct.

3          THE COURT:  Feel free to remove your mask, if you are

4   comfortable doing so.  Your juror questionnaire is there in

5   front of you.  I'll ask you, please, to turn to page 12 and

6   Question 65.  Are you with me?

7          PROSPECTIVE JUROR 0853:  Yes.

8          THE COURT:  All right.  Question 65 asks, would the

9   fact that an indictment charges the defendants lead you to

10  believe that they are, in fact, guilty or make it difficult for

11  you to apply the presumption of innocence, and you answered

12  that question yes.  Did you intend to answer that question yes?

13         PROSPECTIVE JUROR 0853:  I don't think I did.  I

14  think I meant to say no.

15         THE COURT:  You meant to say no.  You know, common

16  principles of the criminal justice system is that a defendant,

17  just because they have been charged, does not -- that's not

18  evidence against them.  Would you have any trouble applying

19  that principle?

20         PROSPECTIVE JUROR 0853:  No, I would not.

21         THE COURT:  And one of the other key principles is

22  that a defendant is presumed innocent; that is, just because

23  they have been charged doesn't make them guilty, and they

24  are -- continue to be presumed innocent unless and until the

25  Government meets their burden to prove their guilt beyond a

1    reasonable doubt.  Could you apply that principle?

2              PROSPECTIVE JUROR 0853:  I could.

3              THE COURT:  All right.  Let's turn, then, to

4    Question 50.  This is on the prior page.  Now, you indicated

5    that -- there's a little bit -- we'll have to figure this out.

6    Question 49 asks whether you've read, seen, or heard anything

7    about the Oath Keepers organization, and you said no.  And

8    Question 50, you were asked have you read, seen, or heard

9    anything about the Oath Keepers organization that would affect

10   your ability to be fair and impartial, and you answered that

11   question yes.  So could you tell us whether you have heard

12   anything about an organization known as the Oath Keepers?

13             PROSPECTIVE JUROR 0853:  I think the answers that I

14   have would be yes, and the answer for 50 would be no.  I think

15   they are in reverse.  I think I was getting tired at this

16   point.

17             THE COURT:  That's all right.  There's a lot of

18   questions, and you are not the first person to mistakenly

19   answer questions in ways different than what you are telling

20   me.

21             So let me ask you the question about what you've

22   read, seen, or heard about the Oath Keepers organization.

23   Could you tell us what you have read, seen, or heard about that

24   organization?

25             PROSPECTIVE JUROR 0853:  Sure.  I heard a lot on the

1   news, which is every day around 4:30 or 5:00, and it was in

2   reference to January 6th.  So I did hear a lot about the Oath

3   Keepers and whether, you know, I agree with them or not, wasn't

4   an issue at this point.

5        THE COURT:  Okay.  And can you tell us what -- when

6   you say heard about them and heard about them in the news, tell

7   us what you have heard -- you have heard about them generally.

8        PROSPECTIVE JUROR 0853:  Generally, I've heard that

9   they were against the Constitution.  January 6, they broke into

10  the Capitol.

11       THE COURT:  They what?

12       PROSPECTIVE JUROR 0853:  Went into the Capitol, was

13  one of the groups that broke into the Capitol and tried to

14  dismantle democracy.  So it was against our Constitution.  Our

15  Capitol building, it was a sacred building, and they entered it

16  and tried to destroy it, our Constitution, our constitutional

17  rights, and to hurt some of the people who were in there, like

18  our Congress people.  Those are the things that I have heard on

19  the news as I watched.

20       THE COURT:  Okay.  So you've -- you have clearly

21  followed the events of that day, listened and watched the news.

22  Let me ask you this:  Given what you have just said and how you

23  describe your understanding of what the organization and

24  members of that organization did that day, do you think you

25  could be fair as a juror to people who are -- who in this case

1   are members of that organization and are accused of conduct on

2   January 6?

3           PROSPECTIVE JUROR 0853:  I think I could be fair in

4   my judgment.  I do believe that, in a judicial court, you

5   follow what the judge is saying to you and how you look at the

6   facts and make determinations from those facts.  Looking at

7   them in that manner, yes, I could.

8           THE COURT:  Okay.  So even though -- you have

9   described what I think anyone would say is an understanding of

10  the conduct of members of that organization sort of went to the

11  pillars of our democracy and threatened people, the safety of

12  people.

13          Now, again, I just need to ask, notwithstanding that

14  impression, do you think you could still put all that aside and

15  view the evidence fairly and impartially against these

16  defendants, notwithstanding those impressions?

17          PROSPECTIVE JUROR 0853:  It would be my attempt to do

18  so if I am selected for the jury.  However, I have to say that

19  I would have to follow the judge's orders.  I've been in many

20  trials before, and I would have to follow the facts.  I don't

21  know the facts.  What I can explain to you is what I heard and

22  saw on TV.  Whether it was true or not is just a matter of an

23  opinion, I would think.

24          THE COURT:  Okay.  Question 46 asks whether you have

25  attended, viewed, or listened to any portion of any

1    Congressional committee hearings about January 6th.  Can you

2    tell us how much of those hearings you have either seen or read

3    about?

4             PROSPECTIVE JUROR 0853:  I would say quite a few.

5             THE COURT:  Quite a few?

6             PROSPECTIVE JUROR 0853:  Yes.

7             THE COURT:  Have you watched those hearings?

8             PROSPECTIVE JUROR 0853:  I did.

9             THE COURT:  And can you give us a sense of how much

10   of those hearings you watched?

11            PROSPECTIVE JUROR 0853:  I tried to watch them all,

12   but I wasn't able to.  I think I would say two-thirds.

13            THE COURT:  Two-thirds of it?

14            PROSPECTIVE JUROR 0853:  Uh-huh.

15            THE COURT:  Did you watch them live?

16            PROSPECTIVE JUROR 0853:  My television.

17            THE COURT:  It's not like you went online

18   after-the-fact to find the hearings and then watched them?  You

19   watched them live?

20            PROSPECTIVE JUROR 0853:  Yes.

21            THE COURT:  And do you recall whether any of those

22   hearings touched on the Oath Keepers?

23            PROSPECTIVE JUROR 0853:  I don't remember anything

24   specifically in those hearings that talked about the Oath

25   Keepers.  No, I don't remember that.

1    THE COURT:  So the January 6 committee was -- they

2    investigated and presented on a number of aspects of the events

3    of January 6th.  Could you set aside from what you viewed in

4    those committee hearings and learned from those hearings and

5    only focus on the facts that are presented here as to these

6    defendants?

7    PROSPECTIVE JUROR 0853:  I tried to answer that

8    question 100 times before I came here.  And I thought about the

9    facts.  I thought about how I felt.  I thought about what I had

10   seen and whether I could actually deal with the facts.  And I

11   came up to the conclusion that I actually could.

12   THE COURT:  Okay.

13   PROSPECTIVE JUROR 0853:  So, you know, that's my

14   feelings of what I could do.

15   THE COURT:  You know, Questions 41 through 43, we've

16   already touched on this in terms of the news that you have

17   consumed about the events of that day.  You have indicated to

18   us that you have seen a lot of videos and watched news

19   coverage.  And so same question that I asked you before, which

20   is that -- again, could you set aside what you have consumed in

21   the news about that day and be a fair and impartial as to these

22   defendants?

23   PROSPECTIVE JUROR 0853:  Which question is this?

24   THE COURT:  41, 42, and 43.

25   PROSPECTIVE JUROR 0853:  I responded appropriately

1    for those answers.

2              THE COURT:  Okay.  So the follow-up question is, it's

3    similar to the questions I have been asking you.  Whatever news

4    you may have consumed about the events of that day, could you

5    set that aside and view the evidence in this case fairly and

6    impartially?

7              PROSPECTIVE JUROR 0853:  Yes.  I do think I could.

8    Uh-huh.

9              THE COURT:  And I want to be clear about what I think

10   I heard you say earlier.  Since you filled this jury

11   questionnaire out, have you seen or read any news about the

12   Oath Keepers?

13             PROSPECTIVE JUROR 0853:  I remember hearing the words

14   Oath Keepers, but what it meant and what it was in relation to,

15   other than the hearings and January 6, I don't remember.

16             THE COURT:  Okay.  Do you remember hearing the name

17   Stewart Rhodes in the last couple of weeks?

18             PROSPECTIVE JUROR 0853:  No.

19             THE COURT:  All right.

20             PROSPECTIVE JUROR 0853:  I don't know a Rhodes for

21   that.

22             THE COURT:  Okay.  If you could turn to page 7,

23   please.  Question 15, asking whether you, a close friend, or

24   family member has ever been employed at the U.S. Capitol in any

25   capacity.  Can you tell us about that?

1          PROSPECTIVE JUROR 0853:  No. 7?

2          THE COURT:  15 on page 7.

3          PROSPECTIVE JUROR 0853:  Okay.  A close friend of

4   mine used to work at the Capitol.  She's retired now.  But yes.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR 0853:  Just a friend.

7          THE COURT:  Could you tell us in what capacity your

8   friend worked at the Capitol?

9          PROSPECTIVE JUROR 0853:  She was an assistant to

10  Congress people.  I'm not sure which one.

11          THE COURT:  And was she working in that capacity on

12  January 6th?

13          PROSPECTIVE JUROR 0853:  No.

14          THE COURT:  And she had retired by then?

15          PROSPECTIVE JUROR 0853:  Long before then.

16          THE COURT:  And have you had a conversation with her

17  about the events of January 6?

18          PROSPECTIVE JUROR 0853:  No, I haven't.

19          THE COURT:  Question 16 asks whether you or a close

20  friend or family member has been employed by the federal

21  government.  Please tell us about that.

22          PROSPECTIVE JUROR 0853:  Yes.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR 0853:  My brother is an attorney

25  who works for FCC.

1          THE COURT:  You said an attorney works for FCC?

2          PROSPECTIVE JUROR 0853:  He did.  He's no longer

3    there.  It's been 15 years.  I work for the federal government.

4          THE COURT:  Okay.  You currently work for the federal

5    government?

6          PROSPECTIVE JUROR 0853:  I do.

7          THE COURT:  You do.  Can you tell us what agency?

8          PROSPECTIVE JUROR 0853:  I'm with the U.S. Office of

9    Personal Management, and I am the senior adviser to write

10   policy on training government-wide.  I write and interpret

11   training policy.

12         THE COURT:  So your brother has worked for the

13   Government; you currently do.  One of the charges in this case

14   is that these defendants intended to resist the authority of

15   the government of the United States and do so with force.  Do

16   you think -- the fact that you work for the federal government

17   and your family, who are employees of the federal government,

18   how would that affect your ability to be fair and impartial, if

19   at all?

20         PROSPECTIVE JUROR 0853:  That's a really good

21   question.  I didn't think about that, but I did swear when I

22   got my job to uphold the rights of this country and the

23   Constitution, but I didn't think of it in terms of what's

24   happening today.  And, in thinking about it, it could be

25   difficult --

1          THE COURT:  Uh-huh.

2          PROSPECTIVE JUROR 0853 -- because I swore I'm ready.

3     As an individual, not as what happened in there.

4          THE COURT:  So if I'm following you correctly, you,

5     like anybody who came to work for the federal government, did

6     you take an oath when you began?

7          PROSPECTIVE JUROR 0853:  Yes.

8          THE COURT:  So, you know, you have taken an oath here

9     too, and you would, if you were selected as a juror, you would

10    take an oath.  That oath would require you to swear that you

11    would be fair and objective and view the evidence impartially

12    and apply the law that I give you.

13         Do you think you would be able to follow those

14    instructions, even though you've also taken this oath as part

15    of your work?  Do you see a conflict between those two things?

16         PROSPECTIVE JUROR 0853:  I do not.  I was a foreman

17    in the one day one trial.

18         THE COURT:  I'm sorry.  What's that?

19         PROSPECTIVE JUROR 0853:  One trial in one day.  It's

20    the same type of jury, and I was a foreman.  I think, in

21    comparison, it's just a lower court, but the actual scenario is

22    pretty much the same.  Is it not?

23         THE COURT:  It's a little bit more complicated and

24    complex than a single day single trial.

25         PROSPECTIVE JUROR 0853:  This is my first time with

1    the Grand Jury.

2            THE COURT:  That's okay.  So just to go back to where

3    I started on this line of questioning, you worked for the OPM.

4    Do you think that fact alone would make it difficult for you to

5    sit in judgment of these defendants?

6            PROSPECTIVE JUROR 0853:  No, it won't.

7            THE COURT:  Okay.  And maybe I'll ask the questions a

8    totally different way.  If you were convinced that the

9    government had not met its burden of proof, would it be

10   difficult for, because of your job, to acquit the defendants?

11           PROSPECTIVE JUROR 0853:  If the facts were there that

12   would make any determination of it, I could.  It would be the

13   facts.

14           THE COURT:  The facts would lead you.  And do you

15   think, for example, that you would face some pressure or it

16   would be difficult for you to go back to your colleagues or OPM

17   and say, you know, I just sat on this jury and I voted to

18   acquit these defendants?  Would that create difficulty for you

19   at work?

20           PROSPECTIVE JUROR 0853:  I don't think so.  Not with

21   the level of where I am now.  Frankly, in any person.  You

22   know?  I'm sorry.  I mean -- but, you know, I wouldn't share

23   what I had unless I actually wanted to share what went on with

24   this trial with my colleagues unless I had to.

25           THE COURT:  So Question 18 asks whether you, a close

1  friend, or family member has ever served in the armed forces.

2  Can you tell us about that?

3  PROSPECTIVE JUROR 0853:  My father, he was in the

4  Army.  He was in World War II.  He was in the Army.  He has

5  transitioned.

6  THE COURT:  Okay.  Question 19 asks whether you have

7  such strong feelings about firearms or the laws concerning

8  firearms that would make it difficult for you to be a fair and

9  impartial juror in this case, and you answered that question

10  yes.  Can you tell us why you answered that question "yes"?

11  PROSPECTIVE JUROR 0853:  Yes.  I think this is more

12  of an emotional policy.  And, like I said, I do watch the news.

13  And seeing so many children who have died just by guns and so

14  many people who have been hurt by guns, I do have an issue

15  with, you know, guns and people, particularly those who outside

16  of the law obtain those guns and kill innocent people.  Yes.

17  I'm really talking too much.

18  THE COURT:  No.  That's what you are here for.

19  There's no allegation in this case that any of these

20  defendants unlawfully acquired a firearm.  Okay.  There's also

21  to my knowledge -- I know this for a fact.  There's no

22  allegation of any defendant in this case nor you'll hear any

23  evidence that any of these defendants discharged, that is, shot

24  the firearms.

25  And let me ask you, in light of that, do you think it

 1   would be -- I may have misspoken slightly.  There may be

 2   evidence of -- some evidence of using for training purposes at

 3   a shooting range.  But, in light of that, do you think your

 4   views about guns would make it hard for you to serve as a juror

 5   in this case?

 6              PROSPECTIVE JUROR 0853:  If guns was no issue, again,

 7   I would have to hear the facts.

 8              THE COURT:  Okay.

 9              PROSPECTIVE JUROR 0853:  And understand the facts

10   because you do know how I feel about guns and, you know, people

11   being killed by guns.

12              THE COURT:  Right.

13              PROSPECTIVE JUROR 0853:  So my view is for guns

14   unlawfully gotten and people being killed by them.

15              THE COURT:  How do you think you would react if you

16   saw guns in this courtroom?  How do you think you would react

17   if you saw guns in this courtroom that were presented as

18   evidence?

19              PROSPECTIVE JUROR 0853:  I don't think that would --

20   that would be a problem.

21              THE COURT:  Okay.

22              PROSPECTIVE JUROR 0853:  You know, I seen guns

23   before.  You know, in Virginia, we have these gun shops, and

24   there's no law.  I guess that means you can go in, and they are

25   all around.  So I've seen guns before.  I've never used one or

1    even touched one probably.  But I seen them before.

2              THE COURT:  Okay.  Question 20 asks whether you or a

3    close friend or family member in the last 5 years has attended

4    a rally, protest, or demonstration or march.  Please tell us

5    about that.

6              PROSPECTIVE JUROR 0853:  Yes.  I went to many marches

7    myself.

8              THE COURT:  You have?

9              PROSPECTIVE JUROR 0853:  Yes.

10             THE COURT:  Can you tell us which march?

11             PROSPECTIVE JUROR 0853:  The Martin Luther King

12   march.  I'm not very young, but I attended many of those.

13   People, it's my culture, who I am.  And I have -- that's pretty

14   much the type of protest.

15             THE COURT:  So let me ask you this:  If you were to

16   learn, as part of this trial, that the defendants had political

17   views that were different than yours, how do you think you

18   would react to that and how do you think it would affect your

19   ability to be a juror?

20             PROSPECTIVE JUROR 0853:  Politically?

21             THE COURT:  Yes.

22             PROSPECTIVE JUROR 0853:  I hear that all the time.

23   It doesn't bother me.  We talk through it.  Sometimes they

24   agree and sometimes we disagree, but we are still friends.

25             THE COURT:  Okay.  Question 21 asks whether you have

1  ever been on the Capitol grounds or inside the Capitol

2  building.  Can you give us -- explain to us why you answered

3  that yes.

4           PROSPECTIVE JUROR 0853:  Yes.  In my graduate

5  studies, I went to the Capitol to the Library of Congress, and

6  my agency, trying to have road trips, to the Capitol.

7           THE COURT:  You know, these are the events that

8  concerns the events of January 6.  You will be seeing video

9  images of the Capitol and events of the Capitol.  Has the fact

10  that you have been a visitor there, both professionally and

11  personally, how would that affect your ability to serve as a

12  juror at all?

13           PROSPECTIVE JUROR 0853:  Would you repeat that?

14           THE COURT:  Sure.  Do you think -- the fact that you

15  visited the Capitol both professionally and personally, do you

16  think that would affect your ability as a juror in this case?

17           PROSPECTIVE JUROR 0853:  I do not.  Again, I focused

18  mostly on the facts.

19           THE COURT:  Okay.  You told us you served as a jury

20  foreperson previously.  So we covered that.

21           All right?  Counsel, any follow-up questions.

22           MR. EDWARDS:  Yes, Your Honor.  Good afternoon.  How

23  you doing, ma'am?

24           PROSPECTIVE JUROR 0853:  Hi.

25           MR. EDWARDS:  Just a couple of questions.  Earlier

1   you had talked about serving on a couple of juries in the past.

2   Did I hear that right?

3           PROSPECTIVE JUROR 0853:  Yes.  One trial jury and one

4   Grand Jury.

5           MR. EDWARDS:  When you did that, it sounded like one

6   the rules you took away from that experience is just listening

7   to the judge and listening to what the judge would rule.

8           PROSPECTIVE JUROR 0853:  Could you repeat that?

9           MR. EDWARDS:  During that experience on the jury, it

10  sounded like one of the rules is that you have to listen to

11  what the judge says.

12          PROSPECTIVE JUROR 0853:  I'm sorry.  I didn't hear.

13          MR. EDWARDS:  No.  That's okay.  After your

14  experience serving on a jury, did you learn that, really, one

15  of the rules to follow was to just listen to everything that

16  the judge tells you to do during the trial?

17          PROSPECTIVE JUROR 0853:  Well, as a trial juror, our

18  instructions come from the judge.

19          MR. EDWARDS:  Right.

20          PROSPECTIVE JUROR 0853:  And yes, I would.

21          MR. EDWARDS:  Okay.

22          PROSPECTIVE JUROR 0853:  Uh-huh.

23          MR. EDWARDS:  And then I just had one other question.

24  You mentioned that you had taken an oath in your last job to

25  follow the Constitution and to defend it; is that right?

```
 1              PROSPECTIVE JUROR 0853:  I'm sorry.  I can't pull
 2   this chair up.
 3              MR. EDWARDS:  No.  It's okay.  Sorry.  You had said
 4   you took an oath at the job that you work at now.
 5              PROSPECTIVE JUROR 0853:  All of the employees do.
 6              MR. EDWARDS:  And it was to uphold the Constitution?
 7              PROSPECTIVE JUROR 0853:  Yes, it is.
 8              MR. EDWARDS:  Yes, ma'am.  It sounded like -- I just
 9   wanted to say is the Constitution required you to be an
10   impartial juror and to just follow the facts.  Do you think
11   that you could do that in this trial?
12              PROSPECTIVE JUROR 0853:  Well, I think the content
13   and the purpose of that swearing was to show my diligence and
14   belief in the work that I did, not just -- to just follow
15   directions.  And, yes, the Constitution is an issue.
16              MR. EDWARDS:  Got it.  Thank you, ma'am.
17              THE COURT:  Any follow-up from defense counsel?
18              MS. HALIM:  Good afternoon, ma'am.  I have a question
19   about your response to Question No. 24 that's on page 7.  I
20   believe that you indicated that you did have concern for the
21   safety of yourself or someone else on January 6; is that right?
22              PROSPECTIVE JUROR 0853:  Which number was that?
23              MS. HALIM:  That's Question No. 24 on page 7.
24              PROSPECTIVE JUROR 0853:  Yes.
25              MS. HALIM:  Could you tell me a little bit about who
```

1   specifically -- whose safety you had concerns for that day?

2          PROSPECTIVE JUROR 0853:  Well, actually, it was for

3   the entire nation and for the entire world.  It wasn't anyone

4   specific.  It was just that it was just so devastating, I

5   think, from what I saw on the news that, you know, I had

6   concerns about people, family, friends, coworkers, for

7   everybody.

8          MS. HALIM:  And then I do have a follow-up question

9   as well.  You indicated that you had been a participant in a

10  few different marches; correct?

11         PROSPECTIVE JUROR 0853:  Yes.

12         MS. HALIM:  Was there anything about your experience

13  in those marches -- or let me ask it a different way.  Do you

14  have an opinion about how your experience in your marches or

15  protests or rallies and how they differed from the protest and

16  rallies that took place on January 6th?

17         PROSPECTIVE JUROR 0853:  The difference is that the

18  protests that I attended were culturally -- cultural-type

19  protests as African-Americans.  And I do see, for me, that that

20  was something different.  There wasn't -- it wasn't to tear

21  down something but to build up more so.  And that's the

22  difference, like I said.

23         MS. HALIM:  Understood.  If there were to be evidence

24  presented at this trial that some individuals thought that

25  Black Lives Matters protesters, for example, were problematic,

1  how would that make you feel?

2        PROSPECTIVE JUROR 0853:  Again, I usually don't

3  determine my feelings by what others feel.  It's by what I

4  feel.  And, yes, black lives do matter.

5        MS. HALIM:  Thank you.  I appreciate your being here

6  and answering all of ours questions.  Thank you so much.

7        PROSPECTIVE JUROR 0853:  Thank you.

8        MR. PEED:  Good afternoon, ma'am.  You talked a lot

9  about looking at the facts and following where the facts go,

10  and that's very admirable for you to do.  And I'm wondering --

11  well, first, you watched January 6 live on TV; is that right?

12        PROSPECTIVE JUROR 0853:  I think I did.  I think I

13  was at home that day when it happened.  Yes.

14        MR. PEED:  And you have seen some videos about it.

15  The judge will instruct all the jurors there's a presumption of

16  innocence.  So do you think, you know, having watched it live

17  and having formed some opinions about what you saw that not

18  just you'll be able to see the facts and go to the facts but

19  presume the innocence of the defendants as you have assessed

20  those facts.  Would that be hard for you?

21        PROSPECTIVE JUROR 0853:  I'm not sure if it would.  I

22  can't answer that question.  I would have to think about it a

23  little more.

24        MR. PEED:  I appreciate that and your honesty.  We

25  all appreciate exactly whatever you feel like you feel, what

1     you want to say to us.

2              PROSPECTIVE JUROR 0853:  Thank you.

3              MR. PEED:  Do you have -- when you were watching it

4     live, did you just come to some conclusions about what you are

5     seeing?

6              PROSPECTIVE JUROR 0853:  When I was watching?

7              MR. PEED:  The events of January 6th, when you were

8     watching it on TV, did you reach any personal conclusions about

9     what you are watching?

10             PROSPECTIVE JUROR 0853:  You are asking if it was

11    something personal that I felt?

12             MR. PEED:  Uh-huh.

13             PROSPECTIVE JUROR 0853:  Sure.  I mean, I think

14    everyone who is a United States American participant, who was

15    born, raised here had feelings about this.  I think it was

16    important that people had feelings about it, whether it's good

17    or bad, but the feelings were there.  Yes.  There were

18    feelings.

19             MR. PEED:  Could you describe what your feelings

20    were?  Could you describe what your feelings were watching?

21             PROSPECTIVE JUROR 0853:  Well, I thought -- first of

22    all, it was quite shocking.  You know, I didn't anticipate it

23    to have happened that way, and the only thing I could remember

24    is just staring and watching it and saying, oh, it's happening.

25    You know?  What is this?  Of course, if you want me to expound

1  more, you know, this is my country.  I love my country.  And to

2  see the Capitol destroyed the way that they were destroying it

3  and for what was my thought.

4           MR. PEED:  Thank you.

5           THE COURT:  All right, ma'am.  Thank you for your

6  time and your answering our questions.  Mr. Douyon will provide

7  you with some additional instructions as you leave the

8  courtroom.

9           PROSPECTIVE JUROR 0853:  Thank you.  Should I take

10  this with me?

11           THE CLERK:  No, I have it.

12     [Prospective Juror 0853 exits.]

13           MS. HALIM:  Are we clear, Your Honor?  Move to strike

14  for cause.  This was a difficult one.  It maybe is not for a

15  reason that's so obvious.  I struggle with the fact that she

16  answered three questions incorrectly.  It was three pretty

17  significant questions.  Long trial.  The devil's in the

18  details.  This is definitely a detailed-oriented trial, and I

19  do have concerns about her capability to keep up.

20           And, in addition, when she struggled answering

21  Mr. Peed's question regarding applying the presumption of

22  innocence.  So, for those reasons, I move to strike her for

23  cause.

24           MR. SHIPLEY:  Your Honor, I join.  I appreciate the

25  effort made -- well over 30 minutes of trying to rehabilitate

1    the juror.  But, within the first minute, she said that the

2    Oath Keepers were against the Constitution; they had gone into

3    the Capitol on January 6 and were trying to hurt me.  It

4    sounded like Mr. Michael Dosey's [phonetic] first trial.  I

5    don't see how that juror could ever be rehabilitated ever.

6    Bless her heart, but I can't count how many times we had to

7    backtrack her in an effort to rehabilitate her.  This early on

8    this juror has sort of expressed that sort of emotional

9    reactions to the events as she saw them unfold and ask her to

10   step back from it is too much.

11           MR. EDWARDS:  Your Honor, we disagree.  I think what

12   we watched was the prospective juror say two things that I

13   think are important for the Court to consider.  One that she

14   actually thought through whether she could do this impartially

15   before they came in this courtroom.  It sounded very sincere,

16   and she came to the conclusion that she could do that.  And

17   then you saw it for yourself, as she sat on the stand, and took

18   time to think about your question rather than a knee-jerk

19   reaction.  She exercised what she did outside the courtroom.

20   She was able to answer she could set aside what she had heard,

21   what she had felt to be able to assess the evidence.

22           THE COURT:  I think this is a close call.  I'm

23   actually going to err on the side of striking her for cause.

24   You know, I don't doubt her sincerity.  I really don't.  I

25   think she was a very thoughtful and introspective juror, but

1   there's just too much points at which she either expressed

2   views about the Oath Keepers, views about her abilities as a

3   juror, and I have real concerns, notwithstanding her good-faith

4   efforts and self-reflection, that she, once in the jury box --

5   if in the jury box, she would have some difficulty overcoming

6   it.  It's a close call.  I would err on the side of striking

7   her for cause, despite having spent nearly 20-plus minutes with

8   her.

9           All right.  We'll do one more, and then we'll take

10  our break.

11          THE CLERK:  Your Honor, this is Juror No. 0336.

12          THE COURT:  All right.  Good afternoon.  Please have

13  a seat.  One moment.

14          Hi, ma'am.  How are you?

15          PROSPECTIVE JUROR 0336:  I'm good.  Thank you.

16          THE COURT:  You are 0336?

17          PROSPECTIVE JUROR 0336:  Yes, Your Honor.

18          THE COURT:  All right.  Terrific.  All right.  Let

19  me -- we can begin with page 11.  Your juror questionnaire is

20  there in front of you.  I'm going to ask you to turn to

21  Questions 49 and 51.  49 had asked whether you have read, seen,

22  or heard anything about the Oath Keepers organization, and you

23  answered no.  Question 51 asked whether you've read, seen, or

24  heard anything about Stewart Rhodes and Kelly Meggs and a few

25  others listed there, and you also answered no.

1          Is your answer to those two questions today the same

2     as it was when you filled out the questionnaire?

3          PROSPECTIVE JUROR 0336:  Yes, Your Honor.

4          THE COURT:  All right.  So, in other words, you

5     continue to not have read, seen, or heard anything about the

6     Oath Keepers or any of the people who are listed in

7     Question 51?

8          PROSPECTIVE JUROR 0336:  Correct.

9          THE COURT:  Okay.  You have indicated -- if you'll

10    please turn to page 41 and -- excuse me.  Question 41, 42, 43

11    on page 10.  You've indicated there that you haven't watched

12    any videos about the events of January 6, but you've watched

13    some news coverage about the events of that day.  Can you give

14    us a sense of how much news you have consumed and in what way

15    you have consumed that news?

16         PROSPECTIVE JUROR 0336:  Yes, Your Honor.  So I

17    have --

18         THE COURT:  You'll forgive me.  I'll ask you to keep

19    your voice up so all the lawyers can hear you.

20         PROSPECTIVE JUROR 0336:  My apologies.  I have heard

21    some news about it on podcasts.  I'm a big podcast person.  I

22    don't have cable.  I'm not really a big visual person.  So I've

23    heard some of the news on podcasts, and I've heard -- I've

24    heard a little bit on NPR too.  So, again, like I said, I'm not

25    really a big cable person.  So I've heard it kind of in

1    passing.  And, of course, I'm a resident.  So, naturally, I've

2    heard conversations about the events.

3         But most of the news that I've heard has been via

4    podcast and via NPR, and it's been informational things that

5    happened.  The fact that this many people are -- have been --

6    I've heard updates on the amount of people that have been, I

7    guess, charged or whatnot, that type of information.  I've

8    heard the fact that there were some people who lost their

9    lives.  That type of information.  I couldn't give you any

10   names.  I couldn't give you any exact --

11        THE COURT:  Gotcha.

12        PROSPECTIVE JUROR 0336:  -- indictments or anything

13   of that nature.

14        THE COURT:  Can you give us a sense of which podcasts

15   you are learning all this from?

16        PROSPECTIVE JUROR 0336:  Sure.  I'm a big fan of a

17   few of them.  I think Code Switch is probably my favorite.  And

18   then I also listen to the daily NPR podcast.  It's a format

19   that has really short news -- pieces of news.  I apologize that

20   I can't give you the name.

21        THE COURT:  I want to be clear.  When you say the

22   daily NPR, you mean the daily NPR podcast and not the daily

23   podcast by the New York Times?

24        PROSPECTIVE JUROR 0336:  No, I don't listen to any

25   podcasts by the New York Times.  I didn't know they had one

1  called the daily.  I apologize.  Yes.  I don't recall the name.

2  I apologize about that.  But it's -- I know that it's by --

3  it's by NPR.

4          THE COURT:  All right.  So, as a juror, we don't --

5  we certainly don't expect people to come into a courtroom

6  without any information, but we would ask that any juror be

7  able to put aside what you have learned and view the evidence

8  fairly and honestly in this case.  Do you think you could do

9  that?

10         PROSPECTIVE JUROR 0336:  Yes, Your Honor.

11         THE COURT:  Is there any reason that you could think

12 that you couldn't be fair and impartial to these defendants?

13         PROSPECTIVE JUROR 0336:  No, Your Honor.

14         THE COURT:  All right.  Let's turn, if you would,

15 please, to page 7, and Question 16 indicates that -- the

16 question was, have you or a close friend or family member ever

17 been employed by the federal government, and you answered yes.

18 Can you tell bus that, please.

19         PROSPECTIVE JUROR 0336:  Yes, Your Honor.  Well, I

20 have an aunt.  She is employed by the U.S.D.A.  My father is an

21 Air Force veteran, and my mother is currently an employee at

22 OPM.

23         THE COURT:  And so one of the charges or accusations

24 in this case is that the defendants sought to forcibly resist

25 the authority of the United States government.  Do you think

1    that charge -- or you would have difficulty being an impartial

2    juror with respect to that charge because of your family's

3    employment with the federal government?

4         PROSPECTIVE JUROR 0336:  No, Your Honor.

5         THE COURT:  Okay.  And you mentioned your father is

6    in the armed services; is that right?

7         PROSPECTIVE JUROR 0336:  Yes, sir.  He's an Air Force

8    veteran.  So he's retired, sir.

9         THE COURT:  All right.  Question 21 asks whether you

10   have ever been on the Capitol grounds or inside the Capitol

11   building.  Can you tell us in what capacity?

12        PROSPECTIVE JUROR 0336:  Yes, sir.  I was a tourist.

13   Taking photos with my best friend.

14        THE COURT:  Okay.  And about how long ago was that?

15        PROSPECTIVE JUROR 0336:  This was in -- oh, I'm

16   sorry, sir.  2008.

17        THE COURT:  Okay.  If I could ask you please to turn

18   to page 12, Question 59.  That question asks have you or a

19   close friend or family member ever been the victim of a crime,

20   whether it was reported or not.  Can you tell us about your

21   answer "yes" to that question.

22        PROSPECTIVE JUROR 0336:  Yes, sir.  In 2018, I was

23   the victim of -- I'm not sure the title of the crime, but I was

24   the victim of, like, a minor sexual assault along with three

25   other women.  A man who is suffering from mental illness came

```
 1   into my apartment.  And he was just, like, grabbing women, and
 2   he grabbed me.  He grabbed -- if I may say, he just grabbed my
 3   breast, and he did the same thing to three or four other women.
 4   And he was -- he was prosecuted and found guilty, and he did go
 5   to prison for a bit.
 6             THE COURT:  Okay.  I'm sorry that you had that
 7   experience.  Can you -- you've told us the person was arrested,
 8   prosecuted, and convicted?
 9             PROSPECTIVE JUROR 0336:  Yes, sir.
10             THE COURT:  Is there anything about that experience
11   that would cause you to think that you would be favorable to
12   one side or the other in this case?
13             PROSPECTIVE JUROR 0336:  No, sir.
14             THE COURT:  And it may be that the same office that
15   prosecuted the person in your case is also the prosecuting
16   office here.  Any reason to think that you would sort of favor
17   them because of your experience?
18             PROSPECTIVE JUROR 0336:  No, sir.  I don't even -- to
19   this day, I still don't know his name, and it was really clear
20   that he was suffering from mental illness.
21             THE COURT:  Got it.
22             PROSPECTIVE JUROR 0336:  So, no, sir.
23             THE COURT:  Okay.  All right.  Any follow-up from the
24   Government?
25             MR. EDWARDS:  No, Your Honor.
```

1          THE COURT:  Anything from defense counsel?

2          MR. WEINBERG:  Just briefly.  I did see that you

3  vote.

4          PROSPECTIVE JUROR 0336:  Yes.

5          MR. WEINBERG:  Do you have any opinion on people that

6  voted for Donald Trump?

7          PROSPECTIVE JUROR 0336:  Yes, sir.

8          MR. WEINBERG:  What is it?

9          PROSPECTIVE JUROR 0336:  I think they are -- I would

10  say that their population, to me, is probably -- what's a good

11  word to use?  They just really seem excited about change in the

12  country.

13          I have a very diverse family.  My family is -- I

14  guess the -- I don't want to use the right term -- the wrong

15  terminology these days, but my family is biracial.  So they are

16  also a very extremely diverse political family.  So I would say

17  that -- they just seem excited about wanting to -- wanting to

18  change the country, you know, the -- they believe that we need

19  to, you know, be more fiscally responsible.  They seem really

20  excited about that.  You know, they seem that they are not

21  happy with the cultural atmosphere and whatnot.  So, yeah, that

22  would be my opinion of them.

23          MR. WEINBERG:  I see you are being very polite with

24  your answer.

25          PROSPECTIVE JUROR 0336:  I wouldn't say that, no.

1    No.  If I had a bad opinion, I would say that.

2            MR. WEINBERG:  Do you think there's some racial

3    connotations for people that support Donald Trump?

4            PROSPECTIVE JUROR 0336:  I would say the vote itself,

5    no.  No, I wouldn't say that.  I definitely have seen -- I try

6    to make sure -- in my job, I deal with so many different types

7    of people, and I would say that they just -- they are just like

8    really gung-ho, you know, about their views and whatnot.

9            MR. WEINBERG:  So you feel you could be fair and

10   impartial to a Donald Trump supporter?

11           PROSPECTIVE JUROR 0336:  Yeah.  I have a friend who

12   is on that side.  You know, I'm -- I'm not excited about that

13   type of thing.  Like, I'm not really excited to be on one side

14   or the other, yeah.

15           MR. WEINBERG:  Thank you.

16           THE COURT:  Thank you very much for your time.

17   Mr. Douyon will show you out of the courtroom and provide you

18   with some additional instructions.

19           PROSPECTIVE JUROR 0336:  You guys, have a good day.

20       [Prospective Juror 0336 exits.]

21           THE COURT:  Okay.  It's 3:05.  Let's take 15 minutes.

22   We'll resume at 3:20.  Thank you, all.

23       [Recess.]

24           THE COURT:  I got my notes from our jury that's

25   deliberating.  So once counsel and parties are back, we'll have

1  to take a break.

2          THE CLERK:  Yes, Your Honor.  This is Juror 1259.

3          THE COURT:  How are you?

4          PROSPECTIVE JUROR 1259:  Good.  Thank you.

5          THE COURT:  You are Juror 1259?

6          PROSPECTIVE JUROR 1259:  Yes.

7          THE COURT:  Terrific.  Thank you.

8          So your juror questionnaire is in front of you.  The

9  first thing I'll ask you to do is please turn to page 11, and

10 Question 49 asks have you read, seen, or heard anything about

11 the Oath Keepers organization, and you answered yes.  And

12 Question 51 asks whether you had read, seen, or heard of

13 Stewart Rhodes, Kelly Meggs, and some other individuals that

14 are listed there.  You answered no.  Question 51, is the answer

15 to that question still no today as it was when you completed

16 this questionnaire?

17         PROSPECTIVE JUROR 1259:  Yes.

18         THE COURT:  All right.  And, in terms of Question 49,

19 can you tell us what you have read, seen, or heard about the

20 organization, Oath Keepers organization?

21         PROSPECTIVE JUROR 1259:  In terms of the Oath

22 Keepers, I think it's mostly been around just the trial, their

23 involvement there.  No specific details just recently that they

24 were involved.  Yeah.

25         THE COURT:  Okay.  So is there anything -- any level

1    of specificity of what you think you have read, heard about the

2    involvement of Oath Keepers on January 6?

3                 PROSPECTIVE JUROR 1259:  I would say no.

4                 THE COURT:  So other than just they have some

5    involvement, you don't have any further detailed understanding

6    of what role if any they played that day?

7                 PROSPECTIVE JUROR 1259:  Correct.

8                 THE COURT:  Okay.  I'll ask you to turn to

9    Questions 41 and 42 and 43.  Those questions were designed to

10   get a sense of how many videos and how much news you have seen

11   about the events of January 6.  So can you just give us an

12   overall sense of how much news you have consumed about the

13   events of that day.

14                PROSPECTIVE JUROR 1259:  Yeah, yeah.  I live in

15   Capitol Hill.  So on January 6, I was watching my television,

16   what was going on.  So I saw the live videos on CNN.  Since

17   then, mostly just similar types of videos, not going into tons

18   of details on the specific individuals or anything, but just

19   the kind of news shots from above or far from kind of all of

20   the happenings there.

21                THE COURT:  And so it's not surprising that anybody

22   who would walk into this courtroom would be exposed somewhat to

23   news and videos about the events of the 6th, but the question

24   we have for you is whether you could put aside what you have

25   seen and read about the events of that day and sit as a fair

1    and impartial juror with respect to these defendants.

2         PROSPECTIVE JUROR 1259:  I believe so, yes.

3         THE COURT:  And you could focus on the evidence

4    that's presented in this case and put aside whatever you may

5    have learned outside the courtroom?

6         PROSPECTIVE JUROR 1259:  I believe so, yes.

7         THE COURT:  All right.  You mentioned you live on

8    Capitol Hill.  Could you tell us approximately how far you live

9    from the Capitol itself?

10        PROSPECTIVE JUROR 1259:  I'm 12th Street Northeast.

11   So about a mile, 1.2 miles-ish.

12        THE COURT:  Okay.  Were you home on -- I think you

13   just told us that you were home that day?

14        PROSPECTIVE JUROR 1259:  Yes.

15        THE COURT:  And tell us what, if anything, you

16   experienced on the day of.

17        PROSPECTIVE JUROR 1259:  Not much other than seeing

18   the news that was going on and then watching it on TV.  I know

19   there was a question in there about, like, whether I was afraid

20   or fearful.  I don't think I had any of those, like, emotions.

21   But, yeah, I was, you know, seeing the news that was going on

22   and then watching it on the TV.  That was about the extent of

23   it.

24        THE COURT:  And did you -- on that day, other than on

25   television, did you observe people in your neighborhood?

1          PROSPECTIVE JUROR 1259:  No.

2          THE COURT:  At all?

3          PROSPECTIVE JUROR 1259:  No.

4          THE COURT:  All right.  So turn to page 7,

5    Question 18, asks whether you or a close friend or family

6    member has ever served in the armed forces.  Could you tell us

7    about that.

8          PROSPECTIVE JUROR 1259:  Yeah.  Both my grandfathers

9    served in the military.  My grandpa is pretty close with me,

10   lives Potomac, Maryland.  He was in the Navy his whole career.

11         THE COURT:  21, you've told us that.  And, 22, that

12   you live close to Capitol hill.  Other than the fact that you

13   live a mile plus away from the Capitol itself, is there anybody

14   else that you would characterize as a close friend or family

15   member who was living on the Hill that day or working on the

16   Capitol grounds?

17         PROSPECTIVE JUROR 1259:  I have other friends, like,

18   that live in the same neighborhood.  I would say none of them

19   are significantly closer than me.  I would say same proximity,

20   and no one, you know, that I would say it was so close that

21   they were, you know, afraid of what was going on or seeing

22   people in their neighborhood or that sort of thing.

23         THE COURT:  So the fact that, you know, the events of

24   that day were in your neighborhood, could you put that aside

25   and focus on the evidence and be fair and impartial to these

1    defendants?

2              PROSPECTIVE JUROR 1259:  Yeah, I believe so.

3              THE COURT:  All right.  If you would turn to page 12.

4    Question 59 asks whether you or a close friend or family member

5    has ever been the victim of a crime, whether it was reported or

6    not, and then 60 asks whether a close friend or family member

7    has ever been a witness to a crime.  Can you tell us about the

8    answers to those questions -- or, actually, it's just

9    Question 60.  Sorry.  I misspoke.  Only Question 60 that you

10   answered yes.

11             PROSPECTIVE JUROR 1259:  I guess I wasn't sure of in

12   terms of crime what level of severity this was speaking to.  We

13   had packages stolen, which I wouldn't consider to be -- I was

14   the victim of a crime, I guess, but I didn't consider that.

15   That's why I checked "no" on 59.

16             In terms of witness to a crime, you know, I've been

17   in the proximity of fights and assaults.  And, I mean, not, you

18   know, directly involved but in the area where things have been

19   going on.  Nothing really specific that jumps to mind.

20             THE COURT:  As part of or connected to whatever

21   assaultive behavior or other potential criminal activity that

22   you witnessed, do you have any reason to interact with the D.C.

23   Metropolitan Police Department?

24             PROSPECTIVE JUROR 1259:  No.

25             THE COURT:  Any reason to interact with the U.S.

```
 1    Attorney's Office for the District of Columbia?

 2              PROSPECTIVE JUROR 1259:  No.

 3              THE COURT:  Okay.  Any questions from government

 4    counsel?

 5              MR. EDWARDS:  No, Your Honor.

 6              THE COURT:  From defense?

 7              MR. SHIPLEY:  Just briefly.  You indicated that you

 8    paid attention to the events on that day.  It doesn't seem like

 9    you followed it too closely in the media since then.  Just kind

10    of familiarity with what you have learned.  You also answered,

11    though, that you do recognize the name Oath Keeper

12    organization.  I presume you didn't know anything about the

13    Oath Keepers organization before January 6; correct?

14              PROSPECTIVE JUROR 1259:  Correct.

15              MR. SHIPLEY:  So, based on what you learned based on

16    your exposure to the media since January 6, what would you

17    describe your understanding of the Oath Keeper organization to

18    be?

19              PROSPECTIVE JUROR 1259:  An organization of

20    individuals that have, you know, like-minded political views

21    that were, you know, involved in the January 6 trial.  That's

22    kind of the extent of what I know from headlines and reading a

23    couple of paragraphs of news articles.

24              MR. SHIPLEY:  Do you have a view of what their

25    like-minded political views were?
```

```
 1              PROSPECTIVE JUROR 1259:  I'd say right-leaning, but
 2   that's about the extent.
 3              MR. SHIPLEY:  Thank you.
 4              THE COURT:  Thank you, Mr. Shipley.
 5              Mr. Peed?
 6              MR. PEED:  Good afternoon.  Do you have any friends
 7   or family who you talked about the election and they thought it
 8   was stolen?  Any family members who thought it was stolen?
 9              THE WITNESS:  No, not that it was stolen, no.
10              MR. PEED:  Thanks.
11              THE COURT:  All right, sir.  Thank you very much for
12   your time.  Mr. Douyon will provide you with some additional
13   questions as you exit the court.
14       [Prospective Juror 1259 exits.]
15              THE CLERK:  Your Honor, this is Juror No. 0481.
16              THE COURT:  All right.  Ma'am, good afternoon.  How
17   are you?
18              PROSPECTIVE JUROR 0481:  Hi.  Good afternoon.
19              THE COURT:  Thank you for your patience in sticking
20   with us today.  You are Juror 0481?
21              THE WITNESS:  Yes, sir.
22              THE COURT:  Your jury questionnaire is there in front
23   of you.  So I'm going to ask you, first, to turn to page 11 of
24   that questionnaire.  I'll ask you to take a look at
25   Questions 49 and 51.  Question 49 asks whether you had read,
```

1    seen, or heard anything about the Oath Keepers organization.

2    You answered no.  Question 51 was whether you had read, seen,

3    or heard anything about Stewart Rhodes, Kelly Meggs, and some

4    others.  You answered that no as well.

5            Is your answer to that question or those questions

6    the same today as it was when you completed the questionnaire?

7            PROSPECTIVE JUROR 0481:  Yes, sir.

8            THE COURT:  All right.  So you still have not read,

9    seen, or heard anything about the Oath Keepers organization or

10   any of those individuals that are listed there?

11           PROSPECTIVE JUROR 0481:  No, sir.

12           THE COURT:  Okay.  Let me ask you to please turn to

13   page 10 and Questions 41, 42, 43.  Those questions we were

14   trying to get at how much news exposure you've had to the

15   events of January 6, 2021, and you indicated largely that you

16   have not had any.  So let me just ask, have you had any

17   exposure to the media -- and that would include social media --

18   to the events of January 6, 2021, at the Capitol?

19           PROSPECTIVE JUROR 0481:  I can't recall.

20           THE COURT:  Do you know what happened generally at

21   the Capitol on January 6 of 2021?

22           PROSPECTIVE JUROR 0481:  No, I'm sorry.

23           THE COURT:  Okay.  Can I ask you in terms of news,

24   how do you receive it, if you do receive those?

25           PROSPECTIVE JUROR 0481:  I honestly don't keep up

```
 1   with news at all.

 2             THE COURT:  Okay.

 3             PROSPECTIVE JUROR 0481:  I guess word of mouth.

 4             THE COURT:  Word of mouth largely?

 5             PROSPECTIVE JUROR 0481:  Yes.

 6             THE COURT:  And you listed The Shade Room.  What is

 7   The Shade Room?

 8             PROSPECTIVE JUROR 0481:  That would be like a social

 9   media page, but it normally speaks about, like, entertainment,

10   like celebrities type of thing.

11             THE COURT:  Gotcha.  Sounds interesting.

12             Okay.  Lastly, turn to page 7.  Question 16 asks

13   whether you or a close friend, family member has ever been

14   employed by the federal government, and you answered the

15   question yes.  Could you tell us about that?

16             PROSPECTIVE JUROR 0481:  My grandmother was employed

17   with the Government when she was alive.

18             THE COURT:  Okay.  Can you tell us in what agency or

19   what capacity?

20             PROSPECTIVE JUROR 0481:  I would say the Treasury

21   Department.

22             THE COURT:  Do you know what she did there?

23             PROSPECTIVE JUROR 0481:  I'm not sure.  I'm sorry.

24             THE COURT:  Okay.  So one of the charges in this case

25   is that the defendants intended to resist the authority of the
```

1    United States government through force.  The fact that your

2    grandmother worked for the Treasury Department, does that

3    affect your ability to be fair and impartial?

4              PROSPECTIVE JUROR 0481:  Not at all.

5              THE COURT:  All right.  Question 18 asks whether you

6    had -- you or a close family member -- close friend or family

7    member ever served in the armed forces.  Can you tell us about

8    that?

9              PROSPECTIVE JUROR 0481:  Yes.  My sister is currently

10   a part of the National Guard in Virginia, and my stepdad was a

11   Marine.

12             THE COURT:  Okay.  I do not believe any Virginia

13   National Guard were sent to D.C. on the 6th.  Let me just ask.

14   Do you have any knowledge from your sister whether she was

15   called to the district on January 6?

16             PROSPECTIVE JUROR 0481:  Not that I know of.  She

17   normally doesn't speak about her job.

18             THE COURT:  She doesn't usually talk about her Guard

19   service?

20             PROSPECTIVE JUROR 0481:  No.

21             THE COURT:  If I could ask you to, please, turn to

22   page 12 and Question 59.  Question 59 and 61, you indicated

23   that you have -- either you or a close friend or family member

24   has been the victim of a crime or testified as a witness in a

25   court proceeding.  So could you tell us about those two

1    answers.

2              PROSPECTIVE JUROR 0481:  Yes.  My mom's old boyfriend

3    was convicted of a crime.  I guess, domestic violence.

4              THE COURT:  Uh-huh.

5              PROSPECTIVE JUROR 0481:  And I had to testify because

6    I was a witness.

7              THE COURT:  Okay.  And so you were a witness against

8    him?

9              PROSPECTIVE JUROR 0481:  Yes.

10             THE COURT:  Because your mother was the victim?

11             PROSPECTIVE JUROR 0481:  Yes.

12             THE COURT:  Sorry to hear that.  As part of that, can

13   you tell us approximately when did that happen, and did that

14   happen in D.C.?

15             PROSPECTIVE JUROR 0481:  I believe the Maryland side.

16   And December, on Christmas day of 2019ish.

17             THE COURT:  So this all happened in Maryland?

18             PROSPECTIVE JUROR 0481:  Yes.

19             THE COURT:  All right.  So is it fair to say that, as

20   part of that, you didn't interact with the D.C. Metropolitan

21   Police Department?

22             PROSPECTIVE JUROR 0481:  No.

23             THE COURT:  And you didn't interact with the U.S.

24   Attorney's Office here in D.C.?

25             PROSPECTIVE JUROR 0481:  No.

1          THE COURT:  To the extent that you had contact with

2    law enforcement and with prosecutors, is there anything about

3    that experience that you think might cause you to favor one

4    side or the other in this case?

5          PROSPECTIVE JUROR 0481:  Not at all.

6          THE COURT:  All right.  Counsel, any follow-up?

7          MR. EDWARDS:  No, Your Honor.

8          THE COURT:  Anything from defense counsel?

9          MR. SHIPLEY:  No, Your Honor.

10         THE COURT:  Thank you very much for your time, and

11   Mr. Douyon will show you out of the courtroom and provide you

12   with some additional instructions.

13         PROSPECTIVE JUROR 0481:  Should I leave this piece of

14   paper here?

15         THE CLERK:  Yes, please.

16     [Prospective Juror 0481 exits.]

17         THE COURT:  All right, folks.  We are going have to

18   take a break here so I can deal with this jury note.  It will

19   probably take about 10 minutes.  Certainly not much longer than

20   that.  Please stay close, and we'll resume as soon as we take

21   care of that.

22     [Recess.]

23         THE CLERK:  Your Honor, this is Juror No. 1091.

24         THE COURT:  How are you?

25         PROSPECTIVE JUROR 1091:  Okay dokey.

1          THE COURT:  You are Juror 1091?

2          PROSPECTIVE JUROR 1091:  Yes.

3          THE COURT:  Feel free to remove your mask, if you

4  feel comfortable doing so.  Thank you for sticking with us

5  through the afternoon.

6          Let's begin with Question 1 in your jury

7  questionnaire.  Before you indicated that you have a major work

8  event.

9          PROSPECTIVE JUROR 1091:  Well, yes.

10         THE COURT:  That was today?

11         PROSPECTIVE JUROR 1091:  Yeah.  It's fine.

12 Everyone -- it's all good.

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR 1091:  It ended today.  It will end

15 in three hours.  It's fine.

16         THE COURT:  Okay.  Sorry about that.

17         All right.  If you would, please, then turn to

18 Question -- let's start with Question 19.  Question 19 asks

19 whether you have such strong feelings about firearms or the

20 laws concerning firearms that it would make it difficult for

21 you to be fair and impartial in this case.  Can you tell us

22 about answering yes?

23         PROSPECTIVE JUROR 1091:  Yes.  I believe guns are the

24 problem.  And there's too many guns, and there's too much

25 access to guns.  And there's not enough background checks on

 1    guns, and there should be more limits on who can have a gun.

 2                THE COURT:  Okay.  So everybody or many people have

 3    strongly held policy views about gun regulation --

 4                PROSPECTIVE JUROR 1091:  Yes.

 5                THE COURT:  -- or the lack of it or the need for

 6    it --

 7                PROSPECTIVE JUROR 1091:  Uh-huh.

 8                THE COURT:  -- or whether it's just right.  There

 9    will be evidence in this case of gun possession.

10                PROSPECTIVE JUROR 1091:  Uh-huh.

11                THE COURT:  However, none of the defendants in this

12    case are charged with illegally possessing a firearm.  Would

13    the fact of there being evidence of firearms -- or let me put

14    it differently.  Would -- your views on gun regulation, do you

15    think it would be difficult for you to be fair and impartial to

16    these defendants as to whom there's likely to be evidence

17    concerning firearms possession?

18                PROSPECTIVE JUROR 1091:  Probably.

19                THE COURT:  And you do not think you could sit fairly

20    and impartially?  Just mere fact that there are guns introduced

21    into evidence in this case --

22                PROSPECTIVE JUROR 1091:  No.  I mean, that's very

23    strong.  No, I would hope that be more impartial than that.

24    Yeah, I would try.

25                THE COURT:  Okay.  Look.  I'm not asking you to give

1    me the answer that you think I --

2              PROSPECTIVE JUROR 1091:  No.  But that's a very

3    strong statement that you just said, and I would hate to be

4    that impartial.  But I really feel like that there should be

5    more checks on gun ownership in this country.  So I don't know.

6    It would be really hard for me to say that I would be

7    impartial.

8              THE COURT:  Okay.  So not only is there likely to be

9    evidence of gun possession, likely to be actual guns brought

10   into evidence here in this courtroom.  How do you think you

11   will react and respond if you see a gun in the courtroom that's

12   presented as evidence?

13             PROSPECTIVE JUROR 1091:  I actually -- I don't think

14   I'd have a problem with that at all.

15             THE COURT:  Okay.  So then going back into what we

16   talked about in terms of your views, you have some

17   reservations?

18             PROSPECTIVE JUROR 1091:  Yeah, I would have.

19             THE COURT:  You have some reservations about whether

20   you could be fair and impartial?

21             PROSPECTIVE JUROR 1091:  Yes.

22             THE COURT:  Okay.  Let me just ask you Question 48 on

23   page 11 and Question 50 on page -- also on page 11.  You

24   indicated that you have heard of the Oath Keepers organization.

25             PROSPECTIVE JUROR 1091:  Uh-huh.

1        THE COURT:  You also indicated that you have heard of

2    Stewart Rhodes, Kelly Meggs, Jessica Watkins.  And you have

3    strong views about the organization as well as those

4    individuals.  Can you tell us about that, please.

5        PROSPECTIVE JUROR 1091:  So for 48, yes, do you have

6    such -- I have very strong opinions.  I feel that it was

7    incredibly wrong.

8        I should tell you about what happened to me on

9    January 6.  I think that's very important.  I had a dentist

10   appointment that morning at 19th and M, which is, you know,

11   not far from the White House, and there were people getting

12   coffee and going and they were going to the rally at the

13   Ellipse that morning.

14       And I was at the dentist, and it was at the point in

15   COVID where you had to stand outside of the building to be let

16   in, and they took your temperature and everything like that.

17   I'm standing outside.  And the city had plywood up out of it,

18   and there was plywood outside the dentist office building.

19       And so I'm standing there waiting to get called in,

20   and there's people milling around and/or walking towards the

21   White House, and the security guard comes out before I can call

22   the dentist office to be let in and says -- and pulls me into

23   the building and says, "You need to wait in here.  Don't go

24   outside.  Just come in here now," without the whole COVID

25   thing.

1            And she tells me that the cleaning lady had left the

2  building recently.  Ten, fifteen minutes before, she had been

3  surrounded by people and harassed by them.  And so she was very

4  nervous and that people in the dental office also expressed

5  fear about that.  And that's stuck with me for the whole year

6  of -- and that was the beginning.  That was like 8:00 a.m.

7  Nothing had happened yet that day.

8            And, a year later, this January 6th, I went back to

9  the office and brought the security guard a present to thank

10  her.  So that's how my day started.

11            THE COURT:  Gotcha.  Gotcha.  Thank you for sharing

12  with us, and that's all that we ask for people to do is to come

13  in and be candid and honest.  Any questions, counsel?

14            MR. EDWARDS:  No, Your Honor.

15            THE COURT:  Thank you very much.  Mr. Douyon, who is

16  not here, will provide you with some additional instructions,

17  and you can just sit right outside the courtroom until he comes

18  back.

19            PROSPECTIVE JUROR 1091:  Thank you.  Do I leave my

20  questionnaire?

21            THE COURT:  Yes.  Please leave your questionnaire

22  there.

23       [Prospective Juror 1091 exits.]

24            THE CLERK:  Juror 0599 has child-care issues and

25  can't come back tomorrow.  Should we call them out of turn?

```
1              THE COURT:  Sure, if he's still here.  It will take
2    me a second.  Counsel, Juror 0599, who was in line 33, has
3    indicated that he has child-care issues tomorrow, so we are
4    going to take him out of turn and bring him in to question him.
5    I also need to find the questionnaire.
6              Sir, come on up and have a seat right here, please.
7              THE CLERK:  Your Honor, this is Juror No. 0599.
8              THE COURT:  How are you, sir?
9              PROSPECTIVE JUROR 0599:  How you doing?
10             THE COURT:  Good.  Thank you.  You are Juror 0599?
11             PROSPECTIVE JUROR 0599:  The paperwork has the last
12   four numbers 676.
13             THE CLERK:  They are going by a different six-digit
14   number.  Let me confirm.  Is this you?
15             PROSPECTIVE JUROR 0599:  Yes, yes, it is.
16             THE COURT:  Okay.  All right.  So you are maybe a
17   different number, but you are Juror 0599 for our purposes.  You
18   can remove your mask, if you feel comfortable doing so, sir.
19             I understand that you've indicated in your jury
20   questionnaire, with respect to Question 1, that you have a
21   six-year-old that I have been taking to school and picking up,
22   and I have doctor's appointment too.  I take GED.
23             PROSPECTIVE JUROR 0599:  GED.
24             THE COURT:  GED classes.  And you have a child-care
25   issue tomorrow.  So the child-care issue that you have
```

1    tomorrow, is that something that happens on a regular basis?

2              PROSPECTIVE JUROR 0599:  Yeah.  Because, you see,

3    basically, I got let go from my job, you know.  So since I got

4    let go, she found another job, and she just started working.

5    Right?

6              THE COURT:  I see.

7              PROSPECTIVE JUROR 0599:  So if she take over and I'm

8    in jury duty, who going to pay rent?

9              THE COURT:  Gotcha.  That makes sense.  I understand.

10             All right.  Any objection, counsel?

11             MR. EDWARDS:  No.

12             THE COURT:  All right.  Mr. Douyon will show you out

13   of the courtroom and provide you with some additional

14   instructions.

15             PROSPECTIVE JUROR 0599:  Okay.

16             THE COURT:  Thank you, sir.

17        [Prospective Juror 0599 exits.]

18             THE COURT:  So we've got -- I asked Mr. Douyon to

19   dismiss everybody but the last two jurors because I think

20   that's all we have time for, and I've got to be somewhere at

21   4:30 and it's already 4:30.

22             THE CLERK:  Your Honor, this is Juror 1406.

23             THE COURT:  How are you?

24             PROSPECTIVE JUROR 1406:  Good afternoon.

25             THE COURT:  Good afternoon.  You are Juror 1406?

```
 1                  PROSPECTIVE JUROR 1406:  Yes.

 2                  THE COURT:  Feel free to remove your mask, if you are

 3      comfortable doing so, and thank you for sticking with us this

 4      afternoon and today.

 5                  Let me ask you, first -- your juror questionnaire is

 6      there in front of you.  If I could ask you to turn to page --

 7      the second page, which is page 6.  At the top of the page,

 8      Question 7 asks do you have any moral, religious, or ethical

 9      beliefs that prevent you from sitting in judgment of another

10      person, and you answered that question, yes.

11                  Can you tell us about that?

12                  PROSPECTIVE JUROR 1406:  I was raised as a Jehovah's

13      Witness.

14                  THE COURT:  You are a Jehovah's Witness, and so it's

15      your generally held religious belief that you cannot sit in

16      judgment of people?

17                  PROSPECTIVE JUROR 1406:  Yes.

18                  THE COURT:  Any objections, counsel?

19                  MR. EDWARDS:  No, Your Honor.

20                  THE COURT:  All right.  Thank you.  Thank you very

21      much.  Mr. Douyon will provide you with some additional

22      instructions as you walk out of the courtroom.

23          [Prospective Juror 1406 exits.]

24                  THE COURT:  I keep forgoing to put this on the

25      record, but 1091 is dismissed for cause, 1406 is dismissed for
```

1   cause, and 0599 is also dismissed for cause.

2          MR. EDWARDS:  I wasn't sure if I heard right.  1406?

3   I didn't know if you said 1506.

4          THE COURT:  1406.  That was just the last juror.

5          MR. EDWARDS:  Right.

6          THE CLERK:  Your Honor, this is Juror No. 2209.

7          THE COURT:  How are you?

8          PROSPECTIVE JUROR 2209:  Good.  How are you?

9          THE COURT:  You are Juror 2209?

10         PROSPECTIVE JUROR 2209:  Yes.

11         THE COURT:  Feel free to remove your mask, if you are

12  comfortable doing so, and thank you for sticking with us

13  through the day.

14         Your jury questionnaire is in front of you.  If I

15  could ask you to turn to page 13 and to Question 72.  I want to

16  see if you answered this question as you intended to.

17  Question 72, if you were selected to serve on this jury, would

18  you consider and respect the view of other jurors even if their

19  views differed from yours in accordance with the Court's

20  instructions, and you answered "no."

21         Did you intend to answer that question "no"?

22         PROSPECTIVE JUROR 2209:  Actually, I think after you

23  just read this sentence, this question now, I think I should

24  answer "yes."

25         THE COURT:  Okay.  So, in other words, you would

1    consider and respect the view of other jurors even if they

2    disagreed with you?

3              PROSPECTIVE JUROR 2209:  Uh-huh.

4              THE COURT:  Okay.  All right.  I'm going to ask you,

5    please, to first turn to page 11 and Questions 49 and 51.  49

6    asks whether you have read, seen, or heard anything about the

7    Oath Keepers organization.  You answered no.  Question 51 asks

8    have you read, seen, or heard anything about Stewart Rhodes,

9    Kelly Meggs, and a list of some other people.  You answered

10   that question no.

11             My question to you is, is your answer the same to

12   those questions as 50, 49 and 51 as it is today when you

13   completed the questionnaire?

14             PROSPECTIVE JUROR 2209:  You mean 49 and 51 the

15   answer I put no?  Yeah.

16             THE COURT:  That's still true today?

17             PROSPECTIVE JUROR 2209:  Yes.

18             THE COURT:  All right.  So it continues to be the

19   case that you have not read, seen, or heard anything about the

20   Oath Keepers organization?

21             PROSPECTIVE JUROR 2209:  No.

22             THE COURT:  And you have not read, seen, or heard

23   anything about Stewart Rhodes, Kelly Meggs, Jessica Watkins,

24   Ken Harrelson, or Thomas Caldwell?

25             PROSPECTIVE JUROR 2209:  Right.

1          THE COURT:  If I could ask you to turn, please, to

2    the prior page, page 10 Questions 41, 42, and 43.  They concern

3    the amount of news coverage that you've seen and the amount of

4    videos you have seen about the events of January 6th.  Can you

5    tell us just generally how much news you have seen about the

6    events of January 6th?

7          PROSPECTIVE JUROR 2209:  So I know things like this

8    happened, but I didn't really pay attention to the news like

9    this because usually what I do -- yeah, but I know this

10   happened.  But when it happened, I don't really focus news on

11   these issue.

12         THE COURT:  Okay.  And can you tell us what, if

13   anything, that you are -- know about the events of January 6

14   based on what you have read about it?

15         PROSPECTIVE JUROR 2209:  Because I work as a teacher

16   at school, and then we know things happen.  So we brought up

17   this, and the school talked about this.  But because I'm a

18   Chinese teacher, so it's not my job to -- so I know this

19   happened, but I didn't, like, discuss with students or

20   coworkers about this.

21         THE COURT:  I see.  So if I understand you, the

22   events of that day came up at your school because you are a

23   Chinese teacher; that's not something you were teaching or

24   discussing with your students?  Is that right?

25         PROSPECTIVE JUROR 2209:  Yeah.  No, I didn't -- yeah.

```
 1              THE COURT:  Okay.

 2              PROSPECTIVE JUROR 2209:  Uh-huh.

 3              THE COURT:  And, to the extent that you have heard

 4    things about the events of January 6th, could you set them

 5    aside and, if you were selected as a juror, be fair and

 6    impartial to these defendants?

 7              PROSPECTIVE JUROR 2209:  From the point of my views

 8    and from what I know, yeah, I think I can be very fair to be a

 9    juror, if I am -- if I am picked as a juror.

10              THE COURT:  Okay.  All right.  Could I ask you to

11    maybe turn to page 11 again, Question 55.  That question asks

12    have you or a close friend or family member ever worked in any

13    aspect of the legal field as a lawyer, prosecutor, criminal

14    defense attorney, or et cetera, and you answered that question

15    yes.  Can you tell us about your answer.

16              PROSPECTIVE JUROR 2209:  Yes.  I have a friend who

17    works as an attorney.  Yes.

18              THE COURT:  Okay.  And can you tell us what type of

19    attorney your friend is?  Do you know what kind of law your

20    friend practices?

21              PROSPECTIVE JUROR 2209:  Usually, we don't talk too

22    much about the work, but I know she does maybe a lot about

23    immigrants or some -- like, maybe like about family things,

24    like divorce things.

25              THE COURT:  Gotcha.  Do you know whether your friend
```

```
 1   does any criminal work at all?

 2               PROSPECTIVE JUROR 2209:  I don't know.

 3               THE COURT:  Okay.

 4               PROSPECTIVE JUROR 2209:  I -- I don't know.  Yeah.

 5               THE COURT:  All right.  From counsel, any follow-up?

 6               MR. EDWARDS:  No, Your Honor.

 7               THE COURT:  Any follow-up from the defense?

 8               MS. HALIM:  No, Your Honor.

 9               MR. WEINBERG:  No, Your Honor.

10               THE COURT:  All right.  Thank you very much.

11   Mr. Douyon will escort you out of the courtroom and will

12   provide you with some additional instructions.

13               PROSPECTIVE JUROR 2209:  Thank you.

14        [PROSPECTIVE JUROR 2209 exits.]

15               THE COURT:  Okay.  Everyone, so that brings us to the

16   end of our day.  I've got eight qualified for the day.  Fewer

17   than I'd hoped.  We had a few interruptions.  We'll get started

18   tomorrow at 9:30, and we'll keep building until the end of the

19   day.

20               Anything anybody wants to discuss before the end of

21   the day?

22               MR. EDWARDS:  Briefly.  I know you have to go.  I

23   know there are some pending legal issues before you.  Do we

24   want to set some time this week, maybe tomorrow?  I don't know

25   if you expect any additional arguments.  We can set time
```

1    Friday, if we are not doing jury selection Friday afternoon.  I

2    just wanted to flag that.

3             THE COURT:  And there's the issue about exhibits.

4    Anything else?

5             MS. HALIM:  I mean, there are issues about firearms.

6    I wanted to raise some additional argument about firearms.  You

7    had set a pretrial conference and see how that comes.  I have

8    some additional legal arguments that I would like to present.

9             THE COURT:  Okay.  Well, we'll see where we are in

10   terms of timing to raise those issues, and we'll take them up

11   when there's some -- when there's a moment to do so.

12            All right.  Thanks, everybody.  We'll see you

13   tomorrow.

14        [Recess.]

15

16

17

18

19

20

21

22

23

24

25

```
1   DISTRICT OF COLUMBIA )
                         :
2   WASHINGTON, D.C.     )

3                   UNITED STATES OF AMERICA
                            VS.
4               ROBERTO A. MINUTA; JOSEPH HACKETT;
                DAVID MOERSCHEL; EDWARD VALLEJO,
5                   CASE NO. CR22-00015

6

7        I, Melanie Wilkins, do hereby certify that the above

8   and foregoing transcript of proceedings in the matter

9   aforementioned was taken by me in machine shorthand on

10  December 06, 2022, and the questions and answers thereto were

11  reduced to writing under my personal supervision using

12  computer-aided transcription, and that the foregoing represents

13  a true and correct transcript of the proceedings upon said

14  hearing.

15

16        I further certify that I am neither counsel nor

17  related to the parties to the action, nor am I in anywise

18  interested in the result of said cause.

19  Dated:  December 07, 2022
    Pages:  65 to 161, inclusive
20

21
                          s/Melanie Wilkins, CRR, RMR
22                        Melanie Wilkins
                          Federal Official Court Reporter
23                        Registered Merit Reporter
                          Certified Realtime Reporte
24

25
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371